[No. 26283-9-III.   Division Three.   August 23, 2011.]

THE STATE OF WASHINGTON, *Respondent*, v. MICHAEL JOSEPH RODRIGUEZ, *Appellant*.

218

*David N. Gasch* (of *Gasch Law Office*), for appellant.

*James P. Hagarty, Prosecuting Attorney*, and *Kevin G. Eilmes, Deputy*, for respondent.

¶1 SIDDOWAY, J. — *State v. Jaime*, 168 Wn.2d 857, 866, 233 P.3d 554 (2010) holds that conducting a trial in a jail courtroom is inherently prejudicial and warranted only if a careful analysis of specific risks presented by a given case supports a conclusion that the security measure is necessary to further an essential state interest. Out of concern for a risk of gang violence, Michael Rodriguez was tried in a courtroom located in the basement of the Yakima County jail on charges of accomplice to first degree murder, unlawfully possessing a firearm, and tampering with a witness. After being convicted on all counts, Mr. Rodriguez appeals, claiming that he was denied due process by the jail-courtroom setting; that the trial court's jury instruction on the special verdict required for a firearm enhancement was improper under *State v. Bashaw*;[1] and that the trial court abused its discretion by failing to sever the witness tampering charge, allowing lay witnesses to refer to him by his street name, "Little Evil," and admitting testimony of a detective and a lay witness on gangs and gang culture. We find no error and, with respect to the *Bashaw* issue, decline to entertain the challenge, which was not raised in the trial court. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

¶2 On Christmas Eve 2005, Michael Rodriguez and Francisco Acevedo stopped at the home of Candy Leifi in Sunnyside, Washington, and asked if she had, or knew where they could buy, methamphetamine. At the time, Ms. Leifi had met Mr. Rodriguez only a few times and knew him only by his street name, Little Evil. She knew that he was a member of a local gang associated with the Norteño gang. Mr. Rodriguez introduced Mr. Acevedo, who was 18 or 19 years old at the time and was also a Norteño, as "Downer." Ms. Leifi was unable to direct them to any methamphetamine, at which point they asked her for money for gas

---

[1] 169 Wn.2d 133, 234 P.3d 195 (2010).

needed to drive back to Yakima. Ms. Leifi later testified that she had a $50 bill but did not trust them to return the change, so she told them she would ride with them to the store and buy them some gas.

¶3 While on the errand, Mr. Rodriguez drove and Mr. Acevedo sat in the front passenger seat, with Ms. Leifi in the backseat, behind Mr. Acevedo. After buying gas, Mr. Rodriguez drove around the Sunnyside area; he and Mr. Acevedo told Ms. Leifi that they were looking for "scraps," which she understood to be a reference to associates of the rival Sureño gang. 8 Report of Proceedings (RP) at 1310. She was unable to tell the two where any "scraps" might live.

¶4 After being out for almost an hour, Mr. Rodriguez saw Rosendo Hernandez, who was walking on the street. He stopped the car and he and Mr. Acevedo called to Mr. Hernandez to come to Mr. Acevedo's window, asking him "what side" he was from—meaning, to Ms. Leifi, his gang affiliation. *Id.* at 1316. She did not hear Mr. Hernandez's response. As Mr. Hernandez neared the car, Mr. Acevedo pulled a sawed-off shotgun, which Ms. Leifi had not seen earlier, and set it on the window, pointed at Mr. Hernandez. Mr. Acevedo then pulled the trigger and Mr. Hernandez fell back, dying almost instantly. Mr. Rodriguez drove off at a normal rate of speed.

¶5 Mr. Rodriguez drove past Ms. Leifi's home without stopping, and she initially feared that he and Mr. Acevedo would kill her. But Mr. Acevedo suggested they take her back and drop her off, and they did—but not before Mr. Rodriguez pulled out a handgun, pointed it at her, and told her that he knew where her family lived and if she said anything he would come after them and after her. She assured him that she would not say anything. After getting her assurance that "we're friends, right?" Mr. Rodriguez allowed Ms. Leifi to leave the car. *Id.* at 1323. Ms. Leifi arrived home frightened and upset, and friends and family helped her hide out for a few days.

¶6 Police officers located and arrested Mr. Acevedo the following day. Mr. Rodriguez initially escaped on foot but was eventually tracked down and brought into custody. Mr. Rodriguez was charged with accomplice to first degree murder while armed with a firearm, first degree unlawful possession of a firearm, and tampering with a witness.

¶7 Prior to Mr. Rodriguez's trial, the State reached a plea agreement with Mr. Acevedo, under which a first degree murder charge against him was reduced to second degree murder and the first degree unlawful possession of a firearm charge against him was dismissed. In exchange, he agreed to testify against Mr. Rodriguez. At trial, Mr. Acevedo's version of events was consistent with Ms. Leifi's. He testified that he and Mr. Rodriguez spent most of their day together on Christmas Eve, driving around in a car they had borrowed from a friend; early in the day Mr. Rodriguez put the shotgun in the car, saying that "I'm gonna shoot me a Scrap," which Mr. Acevedo assumed meant that he planned to kill a member of the Sureño gang. 9 RP at 1477. Mr. Acevedo testified that he did not question the plan or reveal any reluctance, stating:

> I didn't wanna' be you know made out [to] look like a punk, you know. . . . I don' wanna' look stupid, you know, and say, uh, well, nah homie, les' not do that, you know. You know. So I jus' went along with it. You know, if I didn't go along with them, you know, I'd be looked down upon, you know.

*Id.* at 1481-82. He testified it was important not to be looked down upon. *Id.* at 1482. Later, Mr. Acevedo placed the shotgun beside himself on the floor of the car, covered by a blanket.

¶8 Mr. Acevedo testified that when Mr. Rodriguez saw Mr. Hernandez while cruising with Mr. Acevedo and Ms. Leifi later that evening, he said, "[L]ooks like a Scrap right there" before stopping and calling him over to the car. *Id.* at 1483. When Mr. Hernandez responded to their calls by walking to the passenger-side window where Mr. Acevedo

was sitting, Mr. Acevedo testified that he asked him, "[W]hat you bang[?]" meaning, "[W]hat neighborhood gang you from?" *Id.* at 1485. Mr. Hernandez made no response but pulled something silver out of his own left pocket that Mr. Acevedo testified looked like a gun, frightening Mr. Acevedo, who then pulled the trigger on the shotgun. Mr. Acevedo testified that after he shot Mr. Hernandez, Mr. Rodriguez smiled and began driving away. Mr. Acevedo supported Ms. Leifi's testimony of Mr. Rodriguez's threats, testifying that when they dropped Ms. Leifi off, Mr. Rodriguez pulled out a pellet gun that looked like a real gun, pointed it at her, and told her that if she said anything he would kill her family.

¶9 Mr. Acevedo testified that killing or doing a drive-by shooting elevates a member in the gang, and that in shooting Mr. Hernandez, "I guess you could say I was tryin' to impress [Mr. Rodriguez], you know, trying to do for him, you know. I didn't wanna' let him down." *Id.* at 1493.

¶10 The trial court conducted extensive proceedings before trial to address several trial issues, including the extent to which the State would be entitled to offer evidence of gang culture and structure; whether it could identify Mr. Rodriguez by his street name, Little Evil; whether Ms. Leifi would be allowed to testify to her opinion that Mr. Acevedo sought, on the night of the shooting, to advance within the gang; and whether the trial should, as requested by the sheriff, be conducted at a courtroom in the Yakima County jail, rather than in the county courthouse. Eventually, the trial court allowed the State to present much of its desired evidence and agreed to conduct the trial at the courthouse in the county jail.

¶11 Following a two-week trial, Mr. Rodriguez was found guilty of all charges. He appeals, alleging he was denied due process by a prejudicial trial jailhouse-courtroom setting and that the court abused its discretion with respect to decisions regarding expert testimony, refusal to sever

charges, and admitting evidence of Mr. Rodriguez's nick-name, Little Evil.[2]

¶12 We initially stayed this appeal, having certified *State v. Jaime*, No. 25821-1-III (Wash. Ct. App. Aug. 15, 2008), another Yakima case raising the due process impli-cations of conducting a criminal trial in its jailhouse court-room, for direct review by the Washington Supreme Court. Following the decision in *Jaime*, we invited supplemental briefing by the parties and heard oral argument. At the time of argument, we granted Mr. Rodriguez's request for leave to file additional supplemental briefing on an issue suggested by *Bashaw*, which we consider and resolve as well.

## ANALYSIS

### I

¶13 We first address Mr. Rodriguez's assignment of error to the trial court's decision to conduct his trial in the courtroom in the Yakima County jail.

¶14 In *Jaime*, the court held that the conduct of trial in the unique setting of a courtroom contributes a " 'dignity essential to "the integrity of the trial" process,' " and that setting the trial somewhere else instead—and in particular, in a jail—creates a risk of eroding the presumption of innocence. 168 Wn.2d at 867 (quoting *Estes v. Texas*, 381 U.S. 532, 561, 85 S. Ct. 1628, 14 L. Ed. 2d 543 (1965) (Warren, C.J., concurring) (quoting *Craig v. Harney*, 331 U.S. 367, 377, 67 S. Ct. 1249, 91 L. Ed. 1546 (1947))). Because it found that holding a trial in a jail courtroom is

---

[2] At oral argument, Mr. Rodriguez withdrew two issues raised by his appeal, which counsel conceded had been resolved against Mr. Rodriguez's position by intervening case law. We therefore do not address Mr. Rodriguez's arguments in his brief that expert testimony about gangs and gang behavior did not satisfy the *Frye* standard, *Frye v. United States*, 54 App. D.C. 46, 293 F. 1013 (1923), and that no statutory authority exists for pleading, proving, and imposing a firearm enhancement.

inherently prejudicial, " '[c]lose judicial scrutiny is required to ensure that inherently prejudicial measures employed are necessary to further an essential state interest.' " *Id.* at 865 (alteration in original) (internal quotation marks omitted) (quoting *State v. Finch*, 137 Wn.2d 792, 846, 975 P.2d 967, *cert. denied*, 528 U.S. 922 (1999)). While making clear that its decision "should not be misunderstood to suggest that a jailhouse courtroom may never be used for a jury trial," the court held that "trial courts are obligated to undertake a careful analysis of the facts of the situation to determine whether the extraordinary measure is warranted," analogizing the analysis to that undertaken in other inherently prejudicial practices, such as shackling. *Id.* It found the analysis undertaken by the court in Mr. Jaime's case to be insufficient because security concerns were evaluated based on unverified representations made by the prosecutor, with no fact-finding conducted by the trial court. *Id.* at 866. "Moreover, the trial court considered impermissible factors involving convenience in making its decision, as well as general concerns that would be applicable to any defendant who is in custody during trial, namely the risk that jurors might see [Mr.] Jaime being transported in handcuffs from the jail to the courthouse." *Id.* It noted that prior cases addressing prejudicial security measures have permitted them only when necessary to prevent injury to those in the courtroom, to prevent disorderly conduct at trial, or to prevent an escape. *Id.* at 865.

¶15  With these requirements in mind, we review trial management decisions for abuse of discretion. *Id.* "A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons." *In re Marriage of Littlefield*, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997).

¶16  Although the trial court made its decision to conduct Mr. Rodriguez's trial in the courtroom at the jailhouse without the benefit of the Supreme Court's guidance in *Jaime*, it looked to *State v. Hartzog*, 96 Wn.2d 383,

635 P.2d 694 (1981) for guidance and employed a fact-finding process to make its decision. The court heard testimony from officers with the Yakima County Department of Corrections as well as the investigating detective from the Sunnyside Police Department. After defense counsel objected to the trial court's initial determination that the trial be held at the jail, the court scheduled a further presentation of the State's reasons for requesting trial in the jail; characterized the hearing as a *Hartzog* hearing; encouraged the lawyers to read *Hartzog* and *State v. Gonzalez*, 129 Wn. App. 895, 120 P.3d 645 (2005); and told the lawyers, "I want to make a record. If we're going to do the trial here, then we need to be very careful, and we need to be as neutral as we can." RP (Apr. 26, 2007) at 66.

¶17 The State's witnesses testified to ongoing violence in the Sunnyside area involving Norteño and Sureño factions; the fact that Mr. Acevedo, who would be regarded as a "snitch" by associates of the Norteños, would be in danger during transport, *id.* at 86; law enforcement concern about the potential for retribution from members of the victim's family; and the fact that Mr. Rodriguez, who had prior assault convictions, had been involved in incidents while in the jail. The State later offered as evidence a disciplinary record of Mr. Rodriguez while held in the jail, as well as the testimony of the corrections chief of the department of corrections in Yakima that Mr. Rodriguez was considered a key player in the "Nortango" gang within the county jail and the community, and was presently being held in disciplinary isolation as a result of threats made against the chief and other individuals. 2 RP at 317. After hearing testimony and cross-examination over the course of two hearings, the court entertained closing argument from counsel.

¶18 In addition to following a fact-finding process, the court stated the reasons for its decision: the serious nature of the charges, including gang activity and gang rivalry of a most aggravated sort (first degree murder, witness tamper-

ing); testimony from law enforcement about a high level of ongoing gang rivalry and activity in both the community and the jail; the reasonable likelihood that the trial would attract the interest of a large and potentially emotional audience; a foreseeable danger of retributive violence against Mr. Rodriguez or Mr. Acevedo; Mr. Rodriguez's temperament, character, age, physical attributes, and record of disciplinary incidents in the jail; the physical characteristics of the courthouse versus the jail and means of providing security; and steps that could be taken to neutralize the environment in which it would conduct the trial. Finally, in an effort to minimize any prejudice, the trial court told the lawyers that he was willing to provide a cautionary instruction and to discuss reasonable modifications in jailhouse security if desired by the defense.

¶19 Mr. Rodriguez nonetheless alleges an abuse of discretion because (1) the trial court emphasized the fact that the trial was being held in the jail through a "preemptive announcement"; (2) there had not been any actual threats against or by Mr. Rodriguez; and (3) the courthouse itself had security, which could be augmented with additional manpower and equipment. Br. of Appellant at 15-17.

¶20 The trial court informed the jury that the trial was being held in the jailhouse courtroom because of renovations taking place in the county courthouse, an explanation it proposed to the lawyers the week before trial as based on fact, although not the true reason for scheduling the trial in the jailhouse courtroom. The trial court and lawyers discussed the fact that such an announcement might have the salutary effect hoped for by the judge—to deflect speculation that Mr. Rodriguez was in custody or considered dangerous—but might, on the other hand, highlight the irregular trial setting. While the court's decision to make the announcement is a choice that others might not make, we cannot say that it was outside the range of acceptable choices given the facts and the applicable legal standard. Moreover, it was explicitly proposed in advance by the court

and raised no objection from Mr. Rodriguez's lawyer. Because the announcement did not draw attention to prejudicial information about Mr. Rodriguez, it does not constitute manifest constitutional error that we would consider for the first time on appeal. *Cf. Gonzalez,* 129 Wn. App. at 901 (manifest constitutional error occurs where a court's announcement draws attention to the fact that a defendant is indigent, incarcerated, has been transported in restraints, and is being tried under guard).

¶21 With respect to Mr. Rodriguez's remaining arguments, the Supreme Court did not suggest or imply in *Jaime* that a court must be faced with an actual threat before acting to protect trial participants. A trial court judge, grounded in the community, knowing the anticipated content and context of the trial, and who has heard and carefully considered factual information provided by law enforcement and State and defense lawyers familiar to him or her must be free to consider the options in deciding whether a setting outside the usual courthouse is, indeed, "the 'fairest and most reasonable way to handle' defendants who are found to present a serious safety risk"—as *Jaime* acknowledges a jailhouse setting may be. 168 Wn.2d at 865 (quoting *Illinois v. Allen,* 397 U.S. 337, 344, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970)). The trial court did not abuse its discretion in this case.

II

¶22 At a time when Mr. Rodriguez and Mr. Acevedo were going to be tried in a consolidated trial, the trial court agreed to sever the witness tampering count against Mr. Rodriguez for separate trial. It observed at one point that the witness tampering count concerned events that happened later at the jail, had nothing to do with the Christmas Eve shooting, and would involve potentially prejudicial material. Nonetheless, after the State reached its plea agreement with Mr. Acevedo, the court granted a State

motion to rejoin the witness tampering count. Mr. Rodriguez argues that the trial court's reversal of its decision to sever the claims was highly prejudicial, inasmuch as it invited the jury to cumulate evidence to find guilt or infer a criminal disposition. Br. of Appellant at 19-20.

¶23 We review the trial court's denial of a severance motion for manifest abuse of discretion. *State v. King*, 113 Wn. App. 243, 290, 54 P.3d 1218 (2002) (citing *State v. Hoffman*, 116 Wn.2d 51, 74, 804 P.2d 577 (1991)), *review denied*, 149 Wn.2d 1015 (2003). Separate trials are not favored in Washington and a defendant seeking severance has the burden of demonstrating that a joint trial will result in specific unfair prejudice, which outweighs the policy of judicial economy that is served by joint trials. *Id.* To determine whether to sever charges to avoid prejudice to a defendant, a court considers the strength of the State's evidence on each count, the clarity of defenses as to each count, court instructions to the jury to consider each count separately, and the admissibility of the evidence of the other charges even if not joined for trial. *State v. Russell*, 125 Wn.2d 24, 62-63, 882 P.2d 747 (1994), *cert. denied*, 514 U.S. 1129 (1995).

¶24 Notably, Mr. Rodriguez does not point to any of these factors as weighing against joining the counts for trial, and none does. The State's evidence—eyewitness testimony—was strong. Mr. Rodriguez's defenses to the separate counts were clear. The jury was instructed to decide each count separately. Clerk's Papers (CP) at 74 (Instruction 4). It is well settled that evidence of witness tampering is admissible as evidence of consciousness of guilt in the trial of the charge to which the witness's testimony pertains, *e.g.*, *State v. Sanders*, 66 Wn. App. 878, 885-86, 833 P.2d 452 (1992), *review denied*, 120 Wn.2d 1027 (1993); *State v. Bourgeois*, 133 Wn.2d 389, 400, 945 P.2d 1120 (1997) (citing *State v. Kosanke*, 23 Wn.2d 211, 215, 160 P.2d 541 (1945)), and evidence of the murder would have been admissible in a trial on the tampering charge as

motive or res gestae explaining the threat. *Cf. State v. Elmore*, 139 Wn.2d 250, 985 P.2d 289 (1999) (where victim was murdered to prevent her from disclosing prior molestation, that molestation was res gestae evidence explaining the events surrounding the crime), *cert. denied*, 531 U.S. 837 (2000). We find no abuse of discretion here.

### III

¶25 Mr. Rodriguez next assigns error to the trial court's denial, in part, of his motion to exclude reference to his street name, Little Evil. The trial court heard argument on the motion and on a motion for reconsideration, and ultimately ruled that law enforcement witnesses and counsel should use the names Michael or Mr. Rodriguez, but that lay witnesses who knew the defendant as Little Evil could refer to him in the way they normally would. Having heard pretrial testimony from Mr. Acevedo, the trial court expressed its belief that references to Mr. Rodriguez as Little Evil by some witnesses who knew him by that name was "unavoidable." RP (Apr. 9, 2007) at 34, 53-56.

¶26 Mr. Rodriguez argues on appeal that his street name was not relevant evidence. Alternatively, he argues that even if relevant, the probative value of the evidence was substantially outweighed by the danger of unfair prejudice to the defendant. Br. of Appellant at 20-22. We review evidentiary rulings for abuse of discretion. *City of Spokane v. Neff*, 152 Wn.2d 85, 91, 93 P.3d 158 (2004). The process of weighing probative value against prejudicial effect " 'is necessarily a matter addressed to the discretion of the trial court.' " *State v. Veliz*, 160 Wn. App. 396, 413, 247 P.3d 833 (quoting *State v. Chase*, 59 Wn. App. 501, 507-08, 799 P.2d 272 (1990)), *review granted*, 171 Wn.2d 1028 (2011).

¶27 While Mr. Rodriguez argues that Mr. Acevedo and Ms. Leifi had no need to refer to Mr. Rodriguez by his street name because they knew his given name, their knowledge

of his given name was derivative—a result of the legal proceedings. Mr. Acevedo testified that he knew Mr. Rodriguez not only as Little Evil but also as Michael, but he claimed no knowledge of Mr. Rodriguez's full given name. Ms. Leifi testified that "I didn't know his name. Well, I just knew him by Little Evil." 8 RP at 1233. She added that Little Evil was the only way she referred to him.

¶28 The balance struck by the trial court is a reasonable one, with support in cases from a number of jurisdictions that have addressed the issue. *United States v. Farmer*, 583 F.3d 131, 144-48 (2d Cir. 2009) (discussing cases), *cert. denied*, 130 S. Ct. 2365 (2010). Even cases that find prejudicial error where a nickname suggesting a criminal disposition is mentioned unnecessarily make an exception for "references by witnesses who know [the defendant] by that name." *Id.* at 146 (defendant referred to by his nickname, "Murder"). Washington decisions dealing with prejudicial evidence that a defendant has employed an alibi are in accord; in such cases, "it [is] quite proper for the witnesses . . . to identify the accused under the name by which they knew him when they describe[ ] [his] actions to the jury." *State v. Cartwright*, 76 Wn.2d 259, 264, 456 P.2d 340 (1969); *In re Pers. Restraint of Woods*, 154 Wn.2d 400, 423, 114 P.3d 607 (2005) (citing *Cartwright* for propriety of admitting evidence of alias when it was the name some witnesses knew him by). Courts have held that forbidding a witness to use nicknames by which a defendant was known to her "would [place] an undue burden on her testimony." *United States v. Hattaway*, 740 F.2d 1419, 1425 (7th Cir. 1984) (witness use of gang member names "Hitler," "Mad Mad Dog," "Scarface," and "Crazy Horse"). The trial court did not abuse its discretion.

## IV

¶29 Finally, Mr. Rodriguez assigns error to the trial court's ruling that Ms. Leifi and Detective Jose Jaime Ortiz

could testify as experts to general matters concerning gangs and gang behavior. He argues that Ms. Leifi was an unqualified witness and that the evidence was not helpful to the jury. Br. of Appellant at 22-25. The only portions of the trial record that he cites, and therefore the only testimony we review, are 8 RP at 1353-58 and 1407-11. RAP 10.3(a)(6) (arguments should contain references to relevant parts of the record).

¶30  Ms. Leifi testified that growing up in California she had cousins who belonged to the Sons of Samoa gang and that after moving to the Yakima Valley at age 12 (she was 23 at the time of trial) she had been exposed to gangs affiliated with the Norteños and Sureños and knew a few members of gangs affiliated with each. She testified that the manner in which a gang member might be elevated in status is "[u]sually by killing somebody from a rival gang, or robbing somebody's house"; usually more serious crimes "[t]he higher rank they go." 8 RP at 1358.

¶31 Detective Ortiz testified to the colors worn by Norteños (red) and Sureños (dark blue) and that "OG" or "original gangster," a term used by Ms. Leifi, means individuals who became associated with a gang at a young age and have risen through the ranks. *Id.* at 1407-08. He testified that as of Christmas Eve 2005 there was a loose ranking structure in the gangs in the Sunnyside area and that senior members of the gangs, who have already committed crimes, tell younger gang members what to do; also that a gang member can quickly enhance his status within a gang by committing a serious crime, like a drive-by shooting, homicide, burglary, or robbery. Finally, he testified that as of Christmas Eve 2005, Mr. Rodriguez was known to the Sunnyside Police Department to be a member of the Norteño gang, whereas Mr. Acevedo was unknown to the department. *Id.* at 1407-11.

¶32 The decision whether to admit expert testimony is within the discretion of the trial court, *State v. Ortiz*, 119 Wn.2d 294, 310, 831 P.2d 1060 (1992), as is the

determination of whether a witness is qualified to testify as an expert. *State v. Quigg*, 72 Wn. App. 828, 837, 866 P.2d 655 (1994). Practical experience is sufficient to qualify a witness as an expert and the practical knowledge need not be acquired through personal experience. *State v. Yates*, 161 Wn.2d 714, 765, 168 P.3d 359 (2007), *cert. denied*, 554 U.S. 922 (2008). We review a trial court's admission of expert testimony for an abuse of discretion. *Id.* at 762. If the reasons for admitting or excluding the opinion evidence are "fairly debatable," the trial court's exercise of discretion will not be reversed on appeal. *Walker v. Bangs*, 92 Wn.2d 854, 858, 601 P.2d 1279 (1979).

¶33 In *State v. Campbell*, 78 Wn. App. 813, 823, 901 P.2d 1050, *review denied*, 128 Wn.2d 1004 (1995), the court found that the testimony of three police officers about such matters as the meaning of gang terminology, the types of criminal activities in which gangs were involved, gang codes of conduct and discipline, organizational structure, and interactions with other gangs was relevant, assisted the trier of fact, and was properly admitted. This sort of information, as with the information about gangs in the Sunnyside area testified to by Detective Ortiz and Ms. Leifi in this case, is beyond the understanding of persons of average knowledge, education, and experience and can therefore be helpful to a jury.

¶34 A closer question is presented as to Ms. Leifi's qualifications to speak to the role that commission of crime plays in elevating a gang member's status. Her testimony was ambiguous as to whether these were matters of common knowledge to someone with her lifelong exposure to gangs or whether, as she acknowledged elsewhere, given her small circle of gang acquaintances, this was something about which she knew "[n]ot too much." 8 RP at 1357. Still, we conclude that her qualifications were fairly debatable and the admission of her testimony was therefore not reversible error. In addition, and even if she were unqualified to speak to some of the matters elicited by the

State, her expert testimony was of minor importance in light of the testimony of Mr. Acevedo as to his and Mr. Rodriguez's relationship, plans, and activities; her clearly admissible testimony implicating Mr. Rodriguez in the hour-long search leading to the encounter with Mr. Hernandez and describing his indifferent reaction to the shooting and subsequent threats to her; and the expert testimony provided by Detective Ortiz. The improper admission of evidence is harmless error if that evidence is of minor significance to evidence that is, as a whole, overwhelming. *Bourgeois*, 133 Wn.2d at 403.[3]

## V

¶35 By supplemental briefing, Mr. Rodriguez argues that his firearm enhancement must be vacated because the jury was incorrectly instructed that it had to be unanimous to answer the special verdict form in the negative. The challenged instruction provided in part:

> You will also be furnished with a special verdict form. If you find the defendant not guilty of Accomplice to First Degree Murder . . . , you will then use the special verdict form and fill in the blank with the answer "yes" or "no" according to the decision you reach. In order to answer the special verdict form "yes", you must unanimously be satisfied beyond a reasonable doubt that "yes" is the correct answer. If you have reasonable doubt as to the question, you must answer "no".

> Because this is a criminal case, each of you must agree for you to return a verdict.

CP at 100-01 (Instruction 29). An instruction that the jury must be unanimous to answer such a special verdict form

---

[3] In the section of his brief devoted to the trial court's ruling permitting this expert testimony, Mr. Rodriguez makes passing reference to ER 404(b) and the requirement that there be a connection between the crime and a street gang affiliation before evidence of gang membership becomes relevant. *See, e.g., State v. Scott*, 151 Wn. App. 520, 526-27, 213 P.3d 71 (2009), *review denied*, 168 Wn.2d 1004 (2010). He does not seriously argue that there was no nexus between the crime and gang membership in this case, nor could he. It would have been impossible to recount the events leading up to the homicide or an articulable motive for the homicide without discussing gang membership.

"no" is an incorrect statement of law. *Bashaw*, 169 Wn.2d at 147. But Mr. Rodriguez did not object to the instruction.

¶36 We have recently held that instructional error that a jury must deliberate to unanimity to answer "no" to a special interrogatory finding an aggravating factor is not manifest constitutional error and cannot be raised for the first time on appeal. *State v. Guzman Nunez*, 160 Wn. App. 150, 248 P.3d 103, *review granted*, 172 Wn.2d 1004 (2011). Consistent with that decision, we decline to review the issue.

¶37 Affirmed.

KULIK, C.J., and SWEENEY, J., concur.