# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 53583-1-II |
| Respondent, | |
| v. | |
| JACOBI LYNN WEEKLY, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, J.—Jacobi Lynn Weekly physically assaulted his girlfriend, Jasmine Vanguilder, and had sexual intercourse with another woman, AI, twice against her will. The State charged him with two counts of second degree rape of AI and one count of second degree assault of Vanguilder. Based on calls he made to Vanguilder from jail, the State later charged Weekly with three counts of witness tampering. The trial court denied Weekly's motions to sever the witness tampering charges, and a jury convicted Weekly of all counts. The trial court imposed an exceptional upward sentence of 340 months to life.

Weekly appeals his convictions and sentence. He argues the trial court abused its discretion by denying his motions to sever, his offender score includes unconstitutional prior convictions for possession of controlled substances, and the trial court erred by failing to enter written findings supporting the exceptional sentence. He also filed a statement of additional grounds for review (SAG).

We affirm Weekly's convictions, but we reverse his sentence and remand for the trial court to remove his unconstitutional prior convictions from his offender score and resentence him.

FACTS

A.     Background

AI went to her friend John P. Ingersoll's house in August 2018. The two later drove to a store to purchase cigarettes. At the store, they encountered Weekly and Vanguilder, who did not have a permanent residence at the time. Neither AI nor Ingersoll had met Weekly or Vanguilder before. Ingersoll invited Weekly and Vanguilder to his house.

At Ingersoll's home, Ingersoll, AI, Weekly, and Vanguilder stayed up late into the night talking. Ingersoll and Weekly drank alcohol and the women used methamphetamine together. Over the course of the evening, Weekly bragged that he controlled Vanguilder, that she did whatever he asked, and that he could demand sexual intercourse with her whenever he wanted. AI argued with him about his treatment of Vanguilder.

Early the next morning, Ingersoll went to bed. The three guests remained in his house. Ingersoll was a heavy sleeper and also took medication that helped him sleep. He did not wake until late morning. AI remained at Ingersoll's home after he went to bed because she was afraid Weekly and Vanguilder might steal from Ingersoll while he was sleeping because she had seen them looking through his possessions.

Weekly told Vanguilder to ask whether AI would be interested in having sexual intercourse with both Weekly and Vanguilder. AI declined. Weekly began to move toward Ingersoll's bedroom, and when AI attempted to stop him, they engaged in a struggle that ended when Weekly pushed AI hard enough to knock her to the floor, dislodging and breaking her glasses and hearing aid. After pushing AI to the floor, Weekly had intercourse with her.

Weekly then drove Ingersoll's Jeep to the store and other errands, bringing AI and Vanguilder with him. Weekly and Vanguilder got into several arguments throughout the trip, and Weekly choked Vanguilder in the car in front of AI.

Upon returning to Ingersoll's house, Weekly parked the Jeep in the garage and Vanguilder went into the house. Weekly demanded that AI have intercourse with him, and he threatened to harm Vanguilder further if AI refused. AI complied.

Weekly and Vanguilder then left for an appointment with Weekly's probation officer, again in Ingersoll's Jeep, leaving AI in Ingersoll's house. AI eventually left Ingersoll's house on her motorcycle. Upon reaching her home, she called her husband and told him that she had been raped; her husband called 911.

After an interview with police, AI went to the hospital for a forensic sexual assault examination. She had multiple bruises and lacerations, and the nurse collected swabs for DNA testing.

B.     Pretrial

The State charged Weekly with two counts of second degree rape in August 2018. At his arraignment, he was ordered not to contact Vanguilder, AI, or Ingersoll. Weekly made 140 calls from jail to Vanguilder between August 2018 and March 2019. In the calls, he asked Vanguilder to come to court to testify for him, as well as speak to police and his attorney to "[l]et the motherf[*****]s know what happened," and he asked her what she had told investigators. Clerk's Papers (CP) at 203. In one call, Weekly told Vanguilder that "you wouldn't be talking to me like this, b[****], if I was out there, because you know I would smack the fire out of you." CP at 231-32. In another call, he told Vanguilder to tell AI to "clean that s[***] up" and to threaten to tell

AI's husband that AI was having an affair with Ingersoll and using methamphetamine. Verbatim Report of Proceedings (VRP) (May 22, 2019) at 1595. Weekly also told Vanguilder to inform Ingersoll that Weekly and "'his people'" knew where Ingersoll lived. *Id.* at 1598.

The State amended the charges against Weekly on March 15, 2019 to include two counts of second degree rape of AI, one count of second degree assault of Vanguilder, and three counts of witness tampering involving Vanguilder, AI, and Ingersoll. Our record does not indicate when Weekly was arraigned on the amended information.

Weekly moved pretrial to sever the witness tampering charges from the rape and assault charges. Weekly argued that his consent defense to the rapes and his general denial defense to the witness tampering conflicted and that the evidence for the two sets of charges was not cross admissible. The State argued there would be no prejudice from trying the charges together, while severing the charges would waste resources.

The trial court denied the motion to sever, noting that the evidence relevant to the two sets of charges was cross admissible. The trial court explained that the recordings of the jail calls would be relevant to the rape and assault charges because they showed consciousness of guilt, and the recordings were admissible because they were admissions of a party opponent. The trial court concluded, "There doesn't seem to me that there is any economy saved by splitting the case up, and I don't see how there is any prejudice saved, if you will, to the defense because this information was all coming in anyway." VRP (May 2, 2019) at 80.

C.      Trial

AI, Vanguilder, and Weekly all testified that AI and Weekly had a struggle that ended when Weekly shoved AI with enough force to knock her to the floor and dislodge and break her

glasses and hearing aid. AI testified that while she was on the ground, Weekly grabbed her by the throat and told her "everything was going to be okay as long as [she] just cooperated." VRP (May 15, 2019) at 848. AI testified that she did not further resist intercourse with Weekly "[b]ecause he had already overpowered [her] once, and it wouldn't have been hard for him to do it again. [She] figured the best way was to cooperate. That way [she] wouldn't be physically injured more than [she] already was." *Id.* at 864.

Vanguilder testified that when AI was on the ground, Weekly whispered something to AI that Vanguilder could not hear, at which point AI began undressing. The trial court admitted photos of bruises to AI's breast, wrist, and legs, as well as scratches on her neck, which AI's husband testified had not been present before AI went to Ingersoll's house. Ingersoll testified that he woke up the next day to a house containing obvious signs of a struggle, including damage to a kitchen cabinet that looked as if someone had been pushed into it.

Weekly testified that after some encouragement from Vanguilder, AI agreed to intercourse with him and Vanguilder and that AI's initial hesitance was because she did not want to disrespect Ingersoll. Weekly testified that he approached Ingersoll's room to ask him for a ride after AI initially declined intercourse, that AI physically intervened to keep him from waking Ingersoll, and that he only pushed AI to the ground after she grabbed and pushed him first. He testified that as soon as AI got up from the floor and found her hearing aid and glasses, she began undressing. AI then started with a sexual encounter with Vanguilder before Weekly had intercourse with AI. Weekly never asked AI for her consent because "I didn't have to. [Vanguilder] said that she would do it." VRP (May 29, 2019) at 1840.

5

AI testified that after the altercation with Weekly, she hoped to tell Weekly that she was out of cigarettes and wanted to go to the store to buy more, but she really intended to take Ingersoll's Jeep to her house to call the police. She testified that she did not think she would be able to leave without an excuse because Weekly "had already taken [her] phone and thrown it when [she] had tried to leave once," and he had overpowered her. VRP (May 15, 2019) at 871. In addition, AI had arrived at Ingersoll's house on her motorcycle, which required 10 minutes to warm up. "[I]t wasn't quite as simple as just getting into a vehicle and locking the doors and leaving. . . . It is very easy to just push the bike and tip [it] over." *Id*. AI's plan did not work, however, because Weekly insisted on driving Ingersoll's Jeep to the store.

AI, Weekly, and Vanguilder all testified that Weekly and Vanguilder got into an argument during the trip. AI testified that, while at a drive-through window, Weekly asked Vanguilder for money and did not believe that Vanguilder gave him all of her money. AI testified that "they went back and forth," escalating the argument until Weekly "grabbed [Vanguilder] by the throat and started strangling her," while Vanguilder was "grabbing at his hand, trying to get his grip loose." *Id.* at 880. AI testified that Vanguilder began "to turn a little blue in the face" and "was trying to catch a breath and couldn't" as she tried to remove Weekly's hand from her throat. *Id.* at 881. AI testified that after some passersby noticed the scuffle, Weekly let go of Vanguilder's neck, grabbed the methamphetamine pipe sitting in Vanguilder's lap, crushed it, and threw it out of the Jeep.

Vanguilder acknowledged that she and Weekly had an argument and that he pushed her, but she did not say he strangled her. Weekly testified that he yelled at Vanguilder for smoking methamphetamine in the car and broke Vanguilder's pipe. Vanguilder began "flailing" at Weekly, so Weekly pushed her away. VRP (May 29, 2019) at 1823.

6

AI testified that when they returned to Ingersoll's house, Weekly instructed Vanguilder to go into the house and then told AI he wanted to have intercourse with her again. When she declined, he threatened to "take it out on [Vanguilder], if [she] didn't cooperate." VRP (May 15, 2019) at 884. AI did not resist the intercourse because she feared Weekly would hurt Vanguilder. Weekly testified he asked AI if they could have intercourse again in the garage and "she said, yes, if you make it fast. I don't want [Ingersoll] to wake up." VRP (May 29, 2019) at 1824.

Talia Stalcup, the sexual assault nurse examiner at the hospital, testified that AI was in shock when Stalcup examined her. Stalcup took photos of bruises on AI's neck, chin, arms, legs, and breast and took DNA samples from several locations on AI's body for a rape kit. Jennifer Hayden, a forensic scientist at the Washington State Patrol Crime Laboratory, testified that the DNA profile from AI's vaginal swab was 110 nonillion times more likely to have come from AI and Weekly than from AI and a random individual.

Detective Sean P. Conlon, the primary investigator on the rape case, interviewed Vanguilder and was able to identify her voice on the phone calls Weekly made from jail to Vanguilder's phone number. Conlon testified that Weekly called Vanguilder using his own personal identification number from the jail, as well as using other inmates' numbers. Several of Weekly's jail calls to Vanguilder were played for the jury. The jury heard the portions of the jail calls described above.

Before the close of evidence, Weekly moved again to sever the witness tampering charges. The trial court stated that "how the case has played out supports the reasoning for not severing [the charges] in the first place" and denied the motion. VRP (May 30, 2019) at 1851. The jury was

instructed to decide each count separately and that the verdict on one count should not control their verdict on any other count.

D.      Verdict and Sentencing

The jury found Weekly guilty on all counts. The jury answered special verdicts finding domestic violence for the assault and one count of witness tampering, both involving Vanguilder.

Weekly's criminal history consisted of 43 prior convictions, including 12 felonies. His prior criminal history included 14 points, 6 for unlawful possession of a controlled substance convictions. The trial court found that after adding his current convictions, Weekly's offender score was 24 points. The trial court ordered an indeterminate sentence of 280 months to life for the rape conviction. The trial court also ordered a concurrent sentence of 84 months for the assault conviction. The trial court imposed an exceptional upward minimum sentence, running the 60-month sentences for the three witness tampering convictions concurrently to each other but consecutive to the sentence for the rape and assault, for a total indeterminate sentence of 340 months to life. Our record does not contain written findings of fact or conclusions of law supporting the exceptional upward sentence.

Weekly appeals his convictions and sentence.[1]

ANALYSIS

I. MOTION TO SEVER

Weekly argues that the trial court erred by denying his motion to sever the rape and assault charges from the witness tampering charges. He contends that the State's evidence on the rape and assault charges was considerably weaker than the evidence of the witness tampering and that his

---

[1] The State filed a cross appeal that has since been withdrawn.

defenses conflicted. He also asserts the lack of an ER 404(b) limiting instruction allowed the jury to use the separate crimes for improper propensity purposes. And he argues the trial court was incorrect in ruling that the evidence from each set of charges would be cross admissible. Thus, Weekly argues that we must reverse his convictions. We disagree.

A.        Severance for Separate Offenses, Generally

Two or more offenses may be joined for trial when the offenses are "of the same or similar character," "based on the same conduct," or constitute parts of a single scheme or plan. CrR 4.3(a)(1), (2). But CrR 4.4(b) provides that the trial court shall grant a motion to sever if "the court determines that severance will promote a fair determination of the defendant's guilt or innocence of each offense." Joinder and severance issues are often considered together. *State v. Bluford*, 188 Wn.2d 298, 308, 311, 393 P.3d 1219 (2017).

A trial court must weigh the potential prejudice of a combined trial against the benefits of judicial economy. *Id.*; *State v. Bythrow*, 114 Wn.2d 713, 718, 790 P.2d 154 (1990). In determining whether severance is required, a trial court must evaluate (1) the strength of the State's evidence on each count, (2) the clarity of the defenses for each count, (3) the jury's instructions to consider each count separately, and (4) the cross admissibility of evidence if the charges are not joined for trial. *State v. Russell*, 125 Wn.2d 24, 63, 882 P.2d 747 (1994). Then any residual prejudice must be weighed against judicial economy. *Id.*

Where the trial court has refused to sever offenses for separate trials, the defendant bears the burden of demonstrating the trial court abused its discretion. *Id.*

B.      Strength of the State's Evidence

This court has found that a defendant should have received separate trials on rape charges for two different victims when the strength of the State's evidence for one charge was weak and would have been further undermined by impeachment evidence. *State v. MacDonald*, 122 Wn. App. 804, 815, 95 P.3d 1248 (2004). But where the State's evidence for each charge is strong, this factor has weighed against severance because the jury need not "base its finding of guilt on any one count on the strength of the evidence of another." *Bythrow*, 114 Wn.2d at 721-22.

For example, in *State v. Wood*, Division One recently held that a trial court did not err by declining to sever the defendant's rape charges from his charges for solicitation of murder, solicitation of kidnapping, and conspiracy to intimidate a witness. __ Wn. App. 2d ___, 498 P.3d 968, 982 (2021). Division One recognized the charges were supported by evidence of equal strength. *Id.* at 981. Specifically, the rape charge was supported by undisputed evidence that the defendant and victim had intercourse, as well as the testimony of the victim, the forensic nurse's examination, and photos of the victim's injuries. *Id.* The witness intimidation charge was supported by evidence the defendant wrote a letter to a witness asking for help and identifying another witness as a "'rat'" and telephone calls between witnesses discussing recantation of a statement. *Id.*

Similarly here, the rape charges were supported by DNA evidence of intercourse, with evidence of lack of consent from the testimony of AI as well as her husband, the forensic nurse, and Vanguilder, in addition to photos of AI's injuries. The witness tampering charges were supported by multiple recorded phone calls between Weekly and Vanguilder. The assault charge had the weakest evidence, being supported solely by AI's testimony, but Weekly did not argue at

any point that the assault charge should have been separated from the other five charges. *See Russell*, 125 Wn.2d at 63. Thus, this factor weighs against severance.

C.    Clarity of Defenses

The clarity of the defenses for each charge weighs in favor of severance when the defenses were mutually antagonistic "and the defendant demonstrates that presentation of the defenses resulted in prejudice." *State v. Thanh Pham Nguyen*, 10 Wn. App. 2d 797, 819, 450 P.3d 630 (2019). Severance is required "if a defendant makes a convincing showing that [they] have important testimony to give concerning one count and a strong need to refrain from testifying about another." *State v. Watkins*, 53 Wn. App. 264, 270, 766 P.2d 484 (1989). In *Wood*, Division One held Wood's defenses were not inconsistent where he argued consent in response to a rape charge and generally denied a witness intimidation charge. 498 P.3d at 981-82.

Here, Weekly does not demonstrate how his defenses to the two groups of charges were antagonistic, besides stating that the defenses were different. Additionally, Weekly testified regarding all of the charges, and he does not demonstrate that he had important testimony to give regarding one charge but "a strong need to refrain from testifying" about any of the others. *Watkins*, 53 Wn. App. at 270. Indeed, Weekly testified in support of his consent defense to the rapes, denied the assault, and explained his manner on the recorded phone calls as a frustrated, imprisoned man alarmed about his future and his girlfriend's drug use. And Weekly does not argue that he would have testified in only one trial if the charges had been severed. Thus, this factor weighs against severance.

D.      Jury Instructions

"The jury is presumed to follow the instructions of the court." *State v. Grisby*, 97 Wn.2d 493, 499, 647 P.2d 6 (1982). The Washington Supreme Court has held that an instruction for the jury to consider each count separately and not let the verdict on one count control the verdict of another was proper when the "issues and defenses were simple and distinct" and the State presented strong evidence for all counts. *Bythrow*, 114 Wn.2d at 723. In *Bythrow*, although the charges were similar in nature—two robberies committed with a weapon—the Supreme Court concluded this jury instruction was effective for ensuring the jury could compartmentalize the evidence supporting each charge where the trial was short and the issues were relatively straightforward. *Id.*

Here, the trial court instructed the jury to decide each count separately. Although the jury heard eight days of testimony, the issues were distinct—whether AI consented to the intercourse on two occasions, whether Weekly strangled Vanguilder, and whether Weekly attempted to influence the testimony of Vanguilder, AI, and Ingersoll in his phone calls from jail. These issues were also straightforward and the jury is unlikely to have conflated them. The State is also correct that Weekly did not request a limiting instruction beyond that given to the jury. Thus, this factor weighs against severance.

E.      Cross Admissibility

ER 404(b) provides, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith," but such evidence may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." In *Bluford*, the Supreme Court held that

the trial court abused its discretion by joining a string of seven robberies committed over two months by unidentified perpetrators, some accompanied by sex offenses, when none of the charges had cross-admissible evidence and the likely prejudice outweighed the judicial economy benefits. 188 Wn.2d at 315.

In contrast, in *Wood*, Division One held evidence of the rape charge would have been admissible under ER 404(b) as evidence of Wood's motive for the witness intimidation, while the witness intimidation would have been admissible as consciousness of guilt for the rape. 498 P.3d at 982; *see also State v. Sanders*, 66 Wn. App. 878, 885, 833 P.2d 452 (1992) ("[T]he fact of the rape charge would be relevant in a separate trial on the witness tampering to show why the tampering occurred."). Like the rape and witness intimidation charges in *Wood*, "[i]t is well settled that evidence of witness tampering is admissible as evidence of consciousness of guilt in the trial of the charge to which the witness's testimony pertains." *State v. Rodriguez*, 163 Wn. App. 215, 228, 259 P.3d 1145 (2011).

Here, the jail calls would have been admissible in a rape and assault trial as consciousness of guilt, just as the rape and assault would have been admissible in the witness tampering trial to demonstrate motive. *See Sanders*, 66 Wn. App. at 885; *Rodriguez*, 163 Wn. App. at 228. Thus, this factor weighs against severance.

In sum, all four factors weigh against finding prejudice from the combined trial. It was not untenable for the trial court to deny Weekly's motion to sever. We hold that the trial court did not abuse its discretion by denying Weekly's pretrial or renewed motions to sever.

II. SENTENCING

A.  Convictions Now Unconstitutional Under *Blake*

Weekly argues we should remand for resentencing because his offender score included unconstitutional prior convictions. The State concedes the convictions are unconstitutional, but opposes resentencing because Weekly's corrected offender score will still exceed 9 points, leaving the standard range unaffected. We conclude that the trial court must correct Weekly's offender score to eliminate prior convictions for possession of a controlled substance and, as a result, Weekly should be resentenced.

1.  Unconstitutional convictions

In *State v. Blake*, the Supreme Court held that Washington's strict liability drug possession statute, former RCW 69.50.4013(1) (2017), violates state and federal due process. 197 Wn.2d 170, 195, 481 P.3d 521 (2021). "A conviction based on an unconstitutional statute must be vacated" and "cannot be considered in calculating the offender score." *State v. LaBounty*, 17 Wn. App. 2d 576, 581, 487 P.3d 221 (2021). Weekly's offender score included 6 points for prior convictions for unlawful possession of a controlled substance. On remand, the trial court must vacate those convictions and correct Weekly's offender score accordingly.

2.  Resentencing

Our cases have been inconsistent in determining when a reduced offender score warrants resentencing. This court has explained that "a reduced standard range, not a reduced offender score, requires resentencing on remand." *State v. Kilgore*, 141 Wn. App. 817, 824, 172 P.3d 373 (2007) (emphasis omitted) (footnote omitted). But in *State v. McCorkle*, the State failed to prove comparable foreign convictions, resulting in a miscalculation of the offender score that did not

affect the standard range. 88 Wn. App. 485, 499-500, 945 P.2d 736 (1997). We held the error was not harmless because "the record does not clearly indicate that the sentencing court would have imposed the same sentence without the [unproved prior convictions] and the resultant change in offender score." *Id*.

Weekly's corrected offender score will still exceed 9 points for each current conviction. But we also consider whether the defendant was sentenced at the bottom of the standard range. If the trial court imposed a low-end sentence and a reduction of the offender score could not result in a lower sentence within the standard range, then resentencing would not be necessary. *See State v. Johnson*, 61 Wn. App. 539, 552, 811 P.2d 687 (1991). But here, the trial court imposed an exceptional minimum sentence. We recognize the trial court has discretion to impose a different indeterminate sentence, including a lower exceptional minimum sentence or a minimum sentence within the standard range. And although the trial court was clear about its reasoning for imposing the witness tampering sentences consecutive to the rape and assault sentences, the record does not clearly indicate that it would have imposed the same sentences for each conviction if the offender scores were different. Thus, we hold that the facts of this case merit resentencing.

On remand, the trial court must strike the unconstitutional prior convictions from Weekly's offender score and resentence him with the corrected offender score.[2]

## III. SAG ARGUMENTS

Weekly raises two additional issues in his SAG. First, he argues the trial court should have dismissed a juror "after catching her falling asleep." SAG at 1 (ground 2). On the second day of

---

[2] Weekly argues, and the State concedes, the trial court should have entered written findings of fact to support the exceptional sentence. We need not address this issue because we reverse Weekly's sentence and remand for resentencing.

trial, the prosecutor raised a concern that juror 7 was possibly closing her eyes. After observing the juror during the next period of trial, the trial judge and judicial assistant both stated that juror 7 was actively writing notes on a pad positioned at the end of her knee. But looking at her from the attorneys' angle, it might have looked like her eyes were closed when she was, in fact, taking notes. No other concerns were raised about juror 7 for the remainder of the trial. This argument is without merit.

Second, Weekly argues his time-for-trial rights were violated because his trial did not occur within 60 days, stating that he "sat in Pierce County Jail for over 11 months." SAG at 1 (ground 1). Weekly was arrested in August 2018 and trial began in May 2019. The amended information was filed March 15, 2019. Our record does not contain the arraignment on the amended information.

Under CrR 3.3(b)(1)(i), a defendant in custody pending trial must be brought to trial—meaning a trial date must be set—within 60 days of arraignment. *See State v. Nelson*, 131 Wn. App. 108, 113, 125 P.3d 1008 (2006). But continuances may be granted to extend the time period. CrR 3.3(f). A defendant waives their time-for-trial rights under the court rules if they do not timely object to the violation. *State v. Harris*, 130 Wn.2d 35, 45, 921 P.2d 1052 (1996). Our record contains no information about who requested continuances or why they were granted between August 2018 and March 2019. Our record also contains no information about whether Weekly objected to continuances before March 2019. "If a defendant wishes to raise issues on appeal that require evidence or facts not in the existing trial record, the appropriate means of doing so is through a personal restraint petition." *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251

No. 53583-1-II

(1995). On the information provided in our record, Weekly has not demonstrated that a time-for-trial violation occurred.

CONCLUSION

We affirm Weekly's convictions, but we reverse his sentence and remand for the trial court to remove Weekly's unconstitutional prior convictions from his offender score and resentence him considering the corrected offender score.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, J.

We concur:

Le , C.J.

Veljacic, J.