IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>        Respondent and<br>        Cross Appellant,<br><br>        v.<br><br>MICAL DARION ROBERTS,<br><br>        Appellant and<br>        Cross Respondent. | No. 84352-4-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

HAZELRIGG, A.C.J. — Mical Roberts appeals his conviction on one count of murder in the first degree—felony murder—predicated on the underlying offense of burglary in the first degree as an accomplice.  He raises numerous challenges to his conviction including claims of insufficient evidence, ineffective assistance of counsel, prosecutorial misconduct, and evidentiary error.  The State cross appeals only the sentence.  Because Roberts fails to show any error or constitutional violation, we affirm.  However, the court exceeded its statutory authority as to the term of incarceration it imposed and we remand for correction of Roberts' judgment and sentence.  Affirmed in part, reversed in part, and remanded.

## FACTS

The State alleged that, on November 19, 2018, Mical Roberts committed or attempted to commit burglary in the first degree and, in the course of that crime, caused the death of Ricardo Villaseñor.  Roberts waived his right to a jury and his

case proceeded to a bench trial at the conclusion of which he was convicted as charged.

Jennifer Bolanos was dating Villaseñor at the time of the incident and later testified to her recollection of that night. After Bolanos got off work on November 19, 2018, she picked up food around 7:00 p.m. and drove to Villaseñor's house in White Center. Villaseñor and his roommate, Javier Zamora, lived in the downstairs portion of the house and Abraham Madrigal, his wife Ana Lugo Rivera, and their three children lived upstairs. Bolanos entered through the exterior basement door and Villaseñor was the only person in the house when she arrived. The two went into Villaseñor's room, laid down on his bed, and talked about plans for Thanksgiving. Approximately 15 minutes later they heard a noise that sounded like "someone kicked in the front door" on the main floor, followed by "shuffling upstairs." Bolanos explained that she "could hear someone going into the rooms and running into room to room" and that it sounded like they were looking for something. Bolanos thought there were at least two people upstairs because there was "a lot of shuffling and a lot of movement." Less than a minute later, Bolanos heard someone kick the interior door at the top of the stairway that led to the basement and run down the stairs.

Both Villaseñor and Bolanos, who were still in Villaseñor's bedroom with the door closed, stood up and Villaseñor locked the door and "grabbed his gun" from a drawer in his nightstand. Then, someone kicked the outside of the bedroom door and began shooting into the room, at which point Villaseñor returned fire. The exchange of gunfire lasted for about 10 seconds and involved "more than [10] to

20" gunshots. Villaseñor was shot and fell onto the bed and Bolanos "ran into the closet" and "started dialing 9-1-1." Bolanos never heard anyone outside of the bedroom say anything and she did not see who was on the other side of the door. After the gunshots ended, Bolanos "heard them run upstairs," briefly shuffle around, and "leave through the front door." According to Bolanos, the entire sequence of events, from hearing the front door being kicked in upstairs to the intruders leaving the house, occurred within a span of two minutes.

Multiple deputies and detectives from the King County Sheriff's Office (KCSO) who had responded to the shooting later testified to the circumstances they observed at the scene. The front door was open when law enforcement arrived and the door frames of both the front door and Villaseñor's bedroom door were broken. The responding officers found Villaseñor laying on his bed; he had been shot five times and was unresponsive. Deputies and paramedics attempted to resuscitate him but were unsuccessful, and ultimately, Villaseñor was pronounced dead at the scene.

KCSO Detective James Belford testified that, when he entered the basement, he noted "there were [shell] casings[1] scattered throughout the common area outside the bedroom," inside the bathroom across the hallway from the bedroom door, and also inside of the bedroom. There were bullet holes through the bedroom door and in the bedroom wall, and there were also bullet holes through the bathroom door and in the bathroom wall. A total of 23 shell

---

[1] Belford explained that a "shell casing is the brass or metallic part of a bullet that is ejected after the bullet slug is fired through the weapon. The casing houses it, and that is usually what is ejected from the firearm."

casings were recovered; 7 "SIG Sauer, 9-millimeter Luger" casings were found in the bedroom and 16 casings from "different manufacturers" fired from what a forensic firearms analyst later described as a "9-millimeter Luger caliber firearm" were discovered in the area just outside the bedroom. Belford also found drops of blood on the concrete steps at the front door of the house and in the street, blood on the wall by the stairwell that connects the basement apartment with the upstairs portion of the home, and blood on a "movie screen" in the common area downstairs. The blood on the wall looked like "transfer and smear" stains which, Belford explained, indicated that someone had transferred the blood to the wall by touching or sliding against it. Belford collected samples of the different blood deposits and submitted them to the state crime laboratory for DNA testing.

Madrigal, Lugo Rivera, and their children arrived at the house and spoke with police shortly after 8:00 p.m. that night. Madrigal testified that the upstairs portion of the house was "trashed" and "turned upside down," but at least initially, he did not notice that anything was missing. He told deputies that there was about $60,000 in cash in his kitchen and officers ultimately found $83,530 in the pantry. Madrigal later realized and reported that the gun case for his handgun was missing, as well as some extended magazines that he had for it.

KCSO Detective Benjamin Wheeler, the lead on this case, testified to his role in the investigation. Shortly after the homicide, a unit within the Tacoma Police Department (TPD) contacted Wheeler and explained that they had an open, ongoing investigation involving Villaseñor's residence such that TPD had placed a camera facing the house prior to the shooting. TPD provided the video to Wheeler,

who described the footage of the hours surrounding the incident as "fairly dark. You could make out some shapes. You could see the lights of vehicles moving around, but details were—difficult." Wheeler was unable to see anything during the time of the homicide besides "some movement in a car that was in the driveway."

On November 25, 2018, Wheeler received an anonymous tip that someone named Sebastian Beltran may have been involved in the shooting. Wheeler discovered that Beltran had been arrested days earlier on an unrelated offense and that his car, a blue 2002 BMW, had been impounded. Wheeler called the towing company, Lange's Towing, and a staff member confirmed the BMW was on the premises. Wheeler was at Lange's on November 27 when Beltran arrived at the tow yard in a Toyota Prius, along with his mother and a woman who was later determined to be the protected party in an active no-contact order prohibiting Beltran from contacting her. Beltran was arrested on suspicion of violating the no-contact order and the Prius was impounded. A search warrant was authorized for the Prius and law enforcement found a gun box and an extended magazine in the vehicle that matched those that Madrigal had reported stolen. On December 6, the BMW was searched subject to a separate warrant and detectives found shell casings and live rounds in the trunk, along with what appeared to be blood on the inside passenger compartment. Crime scene analysts examined the BMW and took samples of the blood found in the back seat, which was later determined to be a match to Roberts' DNA.

On December 7, 2018, the blood samples from the scene of the shooting came back as a match to Roberts' DNA profile as well. On December 28, 2018, the State charged Mical Roberts with one count of murder in the first degree—felony murder—based on the predicate offense of burglary in the first degree, with a firearm enhancement. Wheeler contacted Roberts' family members and known associates and monitored social media accounts in an effort to locate him. Additionally, the KCSO released information to the media and the case was profiled on Washington's Most Wanted (WMW) with a picture of Roberts.

In January 2019, Wheeler discovered a social media account with a picture of Roberts that contained a direct link to a different page containing the picture of Roberts that had been released by the KCSO. The linked page also contained a reference to the WMW report that stated Roberts was wanted for "home invasion murder." The profile name on the social media account was "The Freshest" and included access to a music video in which Roberts raps about being seen on WMW, mentions the charge of "Murder 1," which was the charge he faced at the time, and says, "Kick his door, stick em' up. Now I got base rock, but two powder packs is really cut."

On March 1, 2019, Roberts was arrested outside of an apartment complex in Tacoma. Roberts' left hand was visibly injured and he told Wheeler that he had been shot in the hand "a couple months" prior. Detectives searched the two-bedroom apartment where Roberts resided incident to his arrest. In the closet of the room Roberts shared with his girlfriend, officers found a notebook with what appeared to be rap lyrics. Roberts' bench trial began on October 11, 2021. At

trial, the court admitted three lines of lyrics from one page from the notebook retrieved from the bedroom closet as exhibit 168.  The lyrics read: "Need to get in touch wit my Ese, I've been needin a lick."  Over defense objection, the trial court also allowed Wheeler to describe the meanings of certain words therein.[2]  During cross-examination, defense counsel asked Wheeler if Beltran was "Hispanic" and if he was associated with a gang.  Wheeler answered both questions in the affirmative.  Defense counsel also asked whether Beltran "was known in the past for committing house robberies" and Wheeler said, "Yes."

Roberts testified in his own defense and stated that, prior to the shooting, he had been to the house in White Center a "handful of times" to purchase heroin from Villaseñor.  Roberts asserted that, on November 19, 2018, while under the influence of heroin, he returned to the house to buy heroin from Villaseñor and entered through the front door upstairs, which was "wide open."  Roberts "went straight downstairs" and saw a person who appeared to be "Hispanic" holding "a gun in his hand."  At that point, according to Roberts, the armed individual made eye contact with Roberts and "[i]mmediately" shot him in the left hand; Roberts "started stumbling around" and "ran out of the house."  As he was leaving, Roberts heard "a lot of gunshots [that] went off right in succession."  Roberts asserted that he became aware of the WMW story in December 2018 and made a rap about being featured in it, which he described as "mockery of an image that the media was portraying [him] to be."  He also confirmed that he wrote the rap lyrics in the notebook.

---

[2] This portion of the trial is detailed in Section III of the analysis, *infra*.

At the conclusion of the trial, the judge found Roberts guilty as charged and entered written findings of fact and conclusions of law in support of the conviction. The judge specifically found Roberts' testimony "not credible" and that Roberts entered the house intending to steal. The court concluded that Roberts committed burglary in the first degree with another individual and caused the death of Villaseñor in the course of that crime. While the court found that the State did not prove Roberts was the shooter or that he knew the other person was armed prior to the shooting, the court concluded that Roberts was guilty of murder in the first degree—felony murder—as an accomplice, and that the charged crime was predicated on burglary in the first degree.

On July 22, 2022, Roberts was sentenced. Based on defense mitigation reports, the trial court concluded that Roberts' "relative youthfulness and developmental immaturity warrant[ed] an exceptional sentence." The trial court imposed 384 months of confinement for the conviction of murder in the first degree and 120 months of confinement for the mandatory firearm enhancement. Exercising its "discretion," the trial court ordered the sentence on the firearm enhancement to run concurrently with the base sentence.

Roberts timely appealed. The State timely cross appealed only as to the portion of the judgment and sentence that ordered concurrent time on the firearm enhancement.

ANALYSIS

I.      Sufficiency of the Evidence

Roberts avers there was insufficient evidence to support his conviction for felony murder in the first degree based on accomplice liability because there was insufficient evidence showing that another person was involved in the crime.[3]  He also assigns error to five findings of fact on that same basis.

When we consider a challenge to the sufficiency of the evidence, "we view the evidence in the light most favorable to the prosecution and ask whether any rational fact finder could have found the essential elements of the crime beyond a reasonable doubt."  *State v. Wentz*, 149 Wn.2d 342, 347, 68 P.3d 282 (2003).  "In claiming insufficient evidence, the defendant necessarily admits the truth of the State's evidence and all reasonable inferences that can be drawn from it."  *State v. Drum*, 168 Wn.2d 23, 35, 225 P.3d 237 (2010); *see also State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992) (the evidence is "interpreted most strongly against the defendant").  This court defers to the finder of fact on issues of witness credibility, persuasiveness, and conflicting testimony.  *In re Pers. Restraint of Martinez*, 171 Wn.2d 354, 364, 256 P.3d 277 (2011).  Circumstantial and direct

---

[3] Roberts also contends the court erred when it found him guilty of murder in the first degree "because a preponderance of evidence established the statutory affirmative defense to felony murder."  Roberts did not raise this defense at trial.

To have this issue considered for the first time on appeal pursuant to RAP 2.5(a)(3), Roberts must show that it is a "'manifest error affecting a constitutional right.'"  *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009) (quoting RAP 2.5(a)).  This requires Roberts to show that both "(1) the error is manifest, and (2) the error is truly of constitutional dimension."  *Id.*  "The defendant must identify a constitutional error and show how, in the context of the trial, the alleged error actually affected the defendant's rights; it is this showing of actual prejudice that makes the error 'manifest.'"  *State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995).  Because Roberts does not address, let alone satisfy, RAP 2.5 in briefing and fails to even allege that this was a manifest constitutional error, we do not consider this assignment of error.

evidence are equally reliable. *State v. Lazcano*, 188 Wn. App. 338, 363, 354 P.3d 233 (2015).

The case law that addresses the scope of appellate review on a sufficiency challenge to a conviction after a bench trial is not a model of clarity. In *Jackson v. Virginia*, the petitioner raised a sufficiency challenge after being convicted of murder in the first degree following a bench trial. 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). The United States Supreme Court explained that "[o]nce a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." *Id.* at 319. In *State v. Green*, our state Supreme Court adopted the *Jackson* test, which "required it to determine whether, *on the whole record*, a rational trier of fact could have found guilt beyond a reasonable doubt." *Green*, 94 Wn.2d 216, 220-21 n.2, 616 P.2d 628 (1980) (emphasis added). The court "later applied that standard, unaltered, to the result of a bench trial in *State v. Salinas*, 119 Wn.2d 192, 201-02, 829 P.2d 1068 (1992)." *State v. I.J.S.*, No. 82559-3-I, slip op. at 5 (Wash. Ct. App. Mar 14, 2022) (unpublished), https://www.courts.wa.gov/opinions/pdf/825593.pdf, *review denied*, 199 Wn.2d 1025 (2022).[4]

Roughly 34 years after *Green*, our Supreme Court issued its opinion in *Homan* and applied a different standard to review a sufficiency challenge to a

---

[4] *State v. I.J.S.* is unpublished and cited pursuant to GR 14.1(c) as necessary for a well-reasoned opinion. We include *I.J.S.* in our analysis of this issue for its clear recitation of the historical development of Washington jurisprudence addressing challenges to the sufficiency of the evidence after bench trials and identification of the conflict with United States Supreme Court precedent.

conviction by a judge after a bench trial.  181 Wn.2d 102, 105-06, 330 P.3d 182

(2014).  Specifically, the court said that,

> following a bench trial, appellate review is limited to determining whether substantial evidence supports the findings of fact and, if so, whether the findings support the conclusions of law. *State v. Stevenson,* 128 Wn. App. 179, 193, 114 P.3d 699 (2005). "Substantial evidence" is evidence sufficient to persuade a fair-minded person of the truth of the asserted premise. *Id.* We treat unchallenged findings of fact and findings of fact supported by substantial evidence as verities on appeal. *Schmidt v. Cornerstone Invs., Inc.,* 115 Wn.2d 148, 169, 795 P.2d 1143 (1990). We review challenges to a trial court's conclusions of law de novo. *State v. Gatewood,* 163 Wn.2d 534, 539, 182 P.3d 426 (2008).

*Id*.  However, the *Homan* court did not explain that it was overruling the precedent set out in *Green* or *Salinas* and "[i]t is a longstanding principle that when our Supreme Court has expressed a clear rule of law, it 'will not overrule such binding precedent sub silentio.'"  *I.J.S.*, slip op. at 6 (quoting *State v. Studd*, 137 Wn.2d 533, 548, 973 P.2d 1049 (1999)).  Nonetheless, the *Homan* standard is "inconsistent with the standard set forth in *Jackson* in five ways."  *State v. Stewart*, 12 Wn. App. 2d 236, 246, 457 P.3d 1213 (2020) (Dwyer, J., concurring).

> First, *Jackson* did not distinguish between a conviction resulting from a trial by jury and a conviction resulting from a bench trial. There are not different standards. The same standard applies in all cases, as the "question whether a defendant has been convicted upon inadequate evidence is central to the basic question of guilt or innocence." *Jackson*, 443 U.S. at 323. However, the Court in *Jackson* did, in fact, review a conviction resulting from a bench trial. 443 U.S. at 309. Irrefutably, the standard set forth in *Jackson* is the correct standard for determining whether a conviction resulting from a bench trial is supported by a constitutionally sufficient quantum of evidence.

> Second, the *Homan* court's standard focuses review on the result reached by the specific trial judge in each case. 181 Wn.2d at 105-06 ("appellate review is limited to determining whether substantial evidence supports the findings of fact"). This is wrong.

*Jackson* requires that a reviewing court determine whether *"any rational trier of fact"* could have found the defendant guilty beyond a reasonable doubt. 443 U.S. at 319. The focus is not on one particular trial judge or one particular juror. To the contrary, it is an objective standard.

Third, the *Homan* standard limits review of the evidence in the record to evidence set forth in the trial judge's factual findings. 181 Wn.2d at 105-06 ("appellate review is limited to determining whether substantial evidence supports the findings of fact"). Again, this is wrong. The *Jackson* standard plainly requires a reviewing court to consider *all* of the evidence, not just the evidence credited by the trial judge in findings of fact. 443 U.S. at 319.

Fourth, the *Homan* standard views only the trial judge's findings of fact in the light most favorable to the prosecution. *See* 181 Wn.2d at 106 ("We treat unchallenged findings of fact and findings of fact supported by substantial evidence as verities on appeal."). In contrast, the *Jackson* standard requires "that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." 443 U.S. at 319.

Fifth, the *Homan* standard requires only "substantial evidence" to support a trial judge's findings of fact supporting a conviction. This is not the same standard as required by the United States Supreme Court. *Jackson* requires a reviewing court to determine that the record contains sufficient evidence to enable any rational trier of fact to find "the essential elements of the crime [proved] beyond a reasonable doubt." 443 U.S. at 319.

In sum, *Homan*'s sufficiency of the evidence standard for reviewing convictions resulting from bench trials conflicts with the *Jackson* standard. It harms the prosecution by narrowing the inquiry on review to consider only a portion—rather than all—of the evidence adduced at trial and by relying solely on whether a specific fact finder—as opposed to any rational fact finder—could reasonably convict the defendant. Simultaneously, it harms defendants by supplanting the demanding beyond a reasonable doubt standard with the less stringent substantial evidence standard.

*Stewart*, 12 Wn. App. 2d at 246-48 (Dwyer, J. concurring) (alteration in original)

(footnote omitted).

- 12 -

Moreover, as this court recently explained, the *Homan* standard of review is problematic as it

> penalizes criminal defendants who invoke their right to a jury trial while, at the same time, incentivizing the waiver of that right. This is so because an appellate challenge to the sufficiency of the evidence to support a conviction will be evaluated differently depending on whether the conviction was the result of a decision made by a jury or by a judge. If a jury returned a guilty verdict, all of the evidence admitted at trial will be considered on appeal to determine if sufficient evidence supports the conviction. However, if the conviction results from a trial judge's finding of guilty, only the evidence described in the court's findings of fact—and the "substantial evidence" supporting those findings—can be considered. In other words, less than all of the evidence can be considered. Obviously, the standard of review mandating that less than all of the evidence be considered is more favorable to a defendant than is the standard of review mandating that all of the evidence be considered. In this way, defendants are punished for invoking their right to a jury trial.

*I.J.S.*, slip op at 8. While the outcome in Roberts' case is the same under either test, because our state Supreme Court has yet to clarify these conflicting standards, we apply both in the hopes of highlighting the need for resolution.

The trial court found Roberts guilty of murder in the first degree—felony murder—predicated on burglary in the first degree, as an accomplice. Roberts' sufficiency challenge goes to the evidence showing that he was an accomplice; more specifically, he asserts that the evidence is insufficient to show that more than one person was involved in the predicate offense of burglary in the first degree.

In cases such as this, where the defendant is not found to be the principal actor, the felony murder statute, RCW 9A.32.030, and the accomplice liability statute, RCW 9A.08.020, provide alternative bases on which a defendant may still be convicted of murder. *Lazcano*, 188 Wn. App. at 364. In relevant part, RCW

- 13 -

9A.32.030(1)(c) provides that an individual is guilty of murder in the first degree if they commit or attempt to commit burglary in the first degree "and in the course of or in furtherance of such crime or in immediate flight therefrom, [they], *or another participant*, causes the death of a person other than one of the participants." (Emphasis added.) Therefore, "though one participant in a predicate felony, alone, commits a homicide during the commission of, or flight from, such felony, the other participant in the predicate felony has, by definition, committed felony murder." *State v. Carter*, 154 Wn.2d 71, 79, 109 P.3d 823 (2005).

For purposes of the felony murder provision, "a 'participant' must either be a principal (i.e., one who actually participates directly in the commission of the crime) or an accomplice (i.e., one who meets the statutory definition of accomplice)." *Id.* Pursuant to RCW 9A.08.020(3)(a), a person is an accomplice of another in the commission of a crime if,

> [w]ith knowledge that it will promote or facilitate the commission of the crime, [that person]:
> (i) Solicits, commands, encourages, or requests such other person to commit it; or
> (ii) Aids or agrees to aid such other person in planning or committing it.

An accomplice may be held liable for the criminal conduct of another person so long as the State proves the "substantive crime was committed and the accused acted with knowledge that [they were] aiding in the commission of the offense." *Carter*, 154 Wn.2d at 77-78; *Lazcano*, 188 Wn. App. at 363.

Roberts argues there is insufficient evidence to prove that he was an accomplice because "the only evidence that more than one person participated in or aided the crime was from Ms. Bolanos" and her testimony "was not sufficient

evidence to prove beyond a reasonable doubt there was more than one person involved in the crime." We disagree.

A.    *Jackson* Standard

Under this test from the United States Supreme Court, we "review *all of the evidence*" in the light most favorable to the State to determine whether "*any* rational trier of fact could have found guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 319; *Salinas*, 119 Wn.2d at 201. The standard is objective. *Stewart*, 12 Wn. App. 2d at 247 (Dwyer, J., concurring). Here, the record contains sufficient evidence to support Roberts' conviction based on his participation in the burglary.

First, Bolanos testified that she heard at least two people upstairs during the incident. Bolanos explained that it sounded like they were looking for something upstairs as there was "a lot of shuffling and a lot of movement." Wheeler confirmed that Bolanos had reported "multiple people were entering the house and moving around upstairs," and in her 911 call, she reported that "two men shot her boyfriend." Moreover, Wheeler confirmed that Bolanos stated in her recorded police interview that she "was certain it was more than one based on what she heard." Though Bolanos did not see the intruders and was unable to identify them, her testimony in this regard was not "unsupported." *See State v. Heutink*, 12 Wn. App. 2d 336, 359, 458 P.3d 796 (2020) (circumstantial evidence as reliable as direct evidence). Moreover, Bolanos testified that the entire incident, from the front door being kicked in to the downstairs shootout, occurred within roughly two minutes. While Roberts' testified that he entered the house alone to purchase drugs and the front door was already wide open, the trial court found him not

credible and this court defers to the finder of fact on issues of witness credibility, persuasiveness, and conflicting testimony. *Martinez*, 171 Wn.2d at 364.

Second, the DNA evidence also supports the finding that more than one person—one of whom was Roberts—was involved in the burglary. Not only did the blood samples taken from the scene of the shooting match his DNA, but Roberts' blood was also discovered in the BMW that Beltran attempted to retrieve from Lange's Towing, and officers found Madrigal's stolen gun case and extended magazine inside the Prius that Beltran was contacted in when he arrived at the tow lot. While Roberts testified that he did not "hang out . . . with Hispanic individuals," had never been inside of Beltran's car, and did not know who Beltran was, the trial court did not find his testimony credible and we do not review such credibility determinations on appeal. *Martinez*, 171 Wn.2d at 364.

Viewing the evidence in the light most favorable to the State and drawing all reasonable inferences in its favor, a rational fact finder could have found that Roberts and another individual participated in the burglary. *See Wentz*, 149 Wn.2d at 347. Bolanos' testimony that there were multiple individuals inside the house and that the entire incident occurred in two minutes, along with the DNA evidence implicating Roberts and his concession that he was in the basement along with another person, leads to a reasonable inference that Roberts was involved in the burglary. *See Salinas*, 119 Wn.2d at 201 ("A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom."). As such, applying the test established by the United States Supreme Court in *Jackson*, Roberts' challenge to his felony murder conviction on the basis

that there was insufficient evidence supporting the finding that he participated in the underlying burglary fails.

B.     *Homan* Standard

According to our state Supreme Court in *Homan*, the scope of our review is "limited to determining whether substantial evidence supports the findings of fact and, if so, whether the findings support the conclusions of law." 181 Wn.2d at 105-06. Substantial evidence exists if the evidence is "sufficient to persuade a fair-minded person of the truth of the asserted premise."[5] *Id.* at 106. Findings that are supported by substantial evidence and those that are unchallenged are verities on appeal. *Id*.

Here, Roberts challenges the following findings of fact:

III.   A short time after her arrival Ms. Bolanos heard someone break in the front door of the upstairs apartment, and heard what appeared from the sound to be more than one person running from room to room. She then heard the someone kick the door to the internal staircase, the door slammed, one or more people ran downstairs. She heard kicking at the door to Mr. Villaseñor's bedroom.

IV.    Mr. Villaseñor grabbed a pistol, locked the bedroom door, another kick to the door, there was an exchange of gunfire, Mr. Villaseñor fell on the bed shot, Ms. Bolanos hid in the bedroom closet and called 911, remaining there until the police arrived when she exited the apartment. Ms. Bolanos had heard at least two people who had broken in.

. . .

XIV. Detective Wheeler discovered that the residence where the shooting occurred had been the subject of an investigation by the Tacoma Police Department, who had posted a video

---

[5] The plain language of this standard alone, as articulated in *Homan*, highlights the inherent conflict with the well-established proof beyond a reasonable doubt standard applied to criminal convictions pursuant to RCW 9A.04.100.

camera outside. Det[ective] Wheeler observed the video taken that night which was of poor quality. The video itself was not offered into evidence, but Wheeler testified that he was able to observe two people leaving the area immediately after the shooting.

. . .

XIX. Mr. Roberts testified that he came to the residence on 1st Avenue SW in order to buy heroin from Mr. Villaseñor. He noticed the upstairs front door open which was unusual since he previously used the outside stairs. He walked down the stairs noting that it was eerily quiet. He did not hear shuffling, slamming, kicking, running nor did he see anyone upstairs. He called out "Ricky" and descended the staircase. As he turned into the living area he saw a Hispanic person standing by the door holding what appeared to be a gun. He testified that he raised his hands, heard a loud noise that he assumed was a gunshot, he realized he had been shot, he stumbled around the apartment for moment, then fled up the stairs and out. As he was fleeing he heard many gunshots. He left the apartment, ran into a trash can, recovered and left on foot. He knew he had a warrant for his arrest on an unrelated matter and he chose to avoid being arrested on that warrant. He ran to a location away from the apartment, called for a ride and was picked up. At some point he discovered that there was publicity naming him a suspect in the murder of Mr. Villaseñor. He composed a rap song which he posted on social media stating that door was kicked in and stick him up. He testified that the video was mockery, a satire of what the police and media said happened. He testified that he does not know that "stick him up" means armed assault. This evidence was not credible.

XX. The evidence of the defendant's blood in the apartment and defendant's blood in a car associated with Beltran, and the fact that a car associated with Beltran contained the fruits of the burglary establish that Mr. Roberts was one of at least two people who entered the building on 1st Avenue SW by kicking in the upstairs front door, kicking at the door in which Mr. Villaseñor was present. Viewing the blood on the screen and by the light switch, ex. 49-51, the court is not persuaded that the blood in the car was transferred by someone other than Mr. Roberts having picked it up by inadvertently touching Mr. Roberts' blood on the screen or the wall by the light switch in the deceased's living room. While one could argue that another person brushed against the smear on the screen and wall which

resulted in the appearance of the blood in the photographs and then deposited it on the rear seat area of the car, the court does not find that to be p[e]rsuasive. Mr. Roberts entered the building intending to steal. He or another fired through the bedroom door, killing Mr. Villaseñor. Whether or not this was a drug house doesn't change these facts that I find are true beyond a reasonable doubt. He is thus guilty of felony murder.

Regarding findings of fact III and IV, Bolanos' testimony directly supports them and constitutes substantial evidence that more than one person burglarized the home. Finding XIX accurately describes Roberts' testimony and we do not review credibility determinations on appeal. *Martinez*, 171 Wn.2d at 364. Further, the court's finding XX, that "Roberts entered the building intending to steal" and "[h]e or another fired through the bedroom door, killing Mr. Villaseñor," is also supported by substantial evidence and is a reasonable inference based on the evidence the trial court referenced in that finding. Thus, findings of fact III, IV, XIX, and XX are all verities.

Roberts is correct that finding XIV is partially unsupported by the record. Specifically, the portion of the finding that indicates Wheeler watched the video footage and "was able to observe two people leaving the area immediately after the shooting." This is expressly contradicted by Wheeler's testimony at trial wherein he stated that he could not see any people in the video footage during the relevant time. Accordingly, this last clause of the final sentence in the finding is not supported by substantial evidence. When a "trial court relies on erroneous or unsupported findings of fact, immaterial findings that do not affect its conclusions of law are not prejudicial and do not warrant reversal." *Coleman*, 6 Wn. App. 2d at 516. Considering the supported and unchallenged findings, this erroneous part

of the court's finding is immaterial. Excluding the erroneous characterization of Wheeler's testimony, substantial evidence still supports the finding that Roberts and another person participated in the burglary, and thus, the unsupported finding does not affect the conclusion of law that Roberts is guilty of murder in the first degree based on the predicate offense of burglary as an accomplice. As the findings of fact support the trial court's conclusion that Roberts committed murder in the first degree based on the predicate offense of burglary in the first degree, the evidence is sufficient to support his conviction under the *Homan* standard. *See Stewart*, 12 Wn. App. 2d at 243.

II.    Ineffective Assistance of Counsel

Roberts contends he was denied his right to effective assistance of counsel because "his attorney did not argue [a particular statutory] affirmative defense or request the court to consider it."

"The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to effective assistance of counsel." *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). "To establish ineffective assistance of counsel the defendant must establish that his attorney's performance was deficient and the deficiency prejudiced the defendant." *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). Specifically, the defendant must satisfy the two-step test from *Strickland v. Washington*, which requires the following:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the

defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). If either step is not met, we need not continue. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996), *overruled on other grounds by Carey v. Musladin,* 549 U.S. 70, 127 S. Ct. 649, 166 L. Ed. 2d 482 (2006).

It is the defendant's burden to establish deficient performance. *Grier*, 171 Wn.2d at 33. To do so, "the defendant must show that counsel's representation fell below an objective standard of reasonableness" in light of "all the circumstances." *Strickland,* 466 U.S. at 688. "Judicial scrutiny of counsel's performance must be highly deferential" and "[t]here is a strong presumption that counsel's performance was reasonable." *Id.* at 689; *Kyllo*, 166 Wn.2d at 862. Counsel is not deficient when their challenged conduct can be characterized as legitimate trial strategy. *Kyllo*, 166 Wn.2d at 863. To establish the prejudice prong, the defendant must "prove that there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different." *Id.* at 862. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

As to the first step of the inquiry, Roberts argues that defense counsel performed deficiently by failing to argue or otherwise raise an affirmative statutory defense to felony murder. "The Sixth Amendment right to control one's defense encompasses the decision to present an affirmative defense." *State v. Coristine*, 177 Wn.2d 370, 376, 300 P.3d 400 (2013). However, "an attorney's failure to

- 21 -

recognize and raise an affirmative defense can fall below the constitutional minimum for effective representation." *Id.* at 379. Because "legitimate trial strategy cannot serve as the basis for a claim of ineffective assistance of counsel," Roberts "must show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel." *In re Pers. Restraint Hubert*, 138 Wn. App. 924, 928, 158 P.3d 1282 (2007); *McFarland*, 127 Wn.2d at 336.

According to Roberts, his trial counsel's failure to raise the affirmative defense was neither legitimate nor reasonable strategy because the affirmative defense was established by a preponderance of the evidence[6] and the "court would have been required to apply it if counsel requested it." RCW 9A.32.030(1)(c), in relevant part, provides as follows:

> [I]n any prosecution under this subdivision (1)(c) in which the defendant was not the only participant in the underlying crime, if established by the defendant by a preponderance of the evidence, it is a defense that the defendant:
> (i) Did not commit the homicidal act or in any way solicit, request, command, importune, cause, or aid the commission thereof; and
> (ii) Was not armed with a deadly weapon, or any instrument, article, or substance readily capable of causing death or serious physical injury; and
> (iii) Had no reasonable grounds to believe that any other participant was armed with such a weapon, instrument, article, or substance; and
> (iv) Had no reasonable grounds to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.

---

[6] "Preponderance of the evidence means that considering all the evidence, the proposition asserted must be more probably true than not true." *State v. Ginn*, 128 Wn. App. 872, 878, 117 P.3d 1155 (2005).

- 22 -

Roberts' argument fails for multiple reasons. First, had Roberts' attorney raised this affirmative defense, Roberts would have assumed the burden to introduce evidence sufficient to prove the four statutory elements and establish that he "was not the only participant in the underlying crime." RCW 9A.32.030(1)(c); *see also Coristine*, 177 Wn.2d at 378 ("This process may influence a wide range of strategic trial decisions, such as who is called to testify, the questions asked on direct and cross-examination, and what arguments are made in summation."). At trial, in the absence of the affirmative defense, the State alone carried the burden of proof. The defense theory was that Roberts was not involved in the underlying burglary and he testified accordingly. He asserted that he entered the house by himself to purchase heroin from Villaseñor and was shot by a man he did not recognize when he walked downstairs. In this procedural posture, Roberts only needed to demonstrate that the State's evidence was not sufficient to prove the elements of the charged crime beyond a reasonable doubt.

Second, and more critically, the evidence presented at trial did not establish the elements of this affirmative defense by a preponderance. This court views the evidence in the light most favorable to the State and asks whether a rational trier of fact could have found that Roberts failed to prove the affirmative defense by a preponderance of the evidence. *State v. Lively*, 130 Wn.2d 1, 17, 921 P.2d 1035 (1996). Roberts insists that the evidence proved, and the court found, that he was "not the shooter." He mischaracterizes the judge's findings. The trial court did *not* affirmatively find that Roberts was not the shooter, rather, it found that the State "ha[d] not proved beyond a reasonable doubt" that he was the one who actually

shot Villaseñor. Specifically, the court found that either "[Roberts] or another fired through the bedroom door, killing Mr. Villaseñor." Contrary to Roberts' contention, the evidence does not establish that it was more likely than not that Roberts "[d]id not commit the homicidal act or in any way solicit, request, command, importune, cause, or aid the commission thereof." RCW 9A.32.030(1)(c)(i). While Roberts offered testimony that supported this element of the defense, the trial court found that his testimonial evidence was not credible, and thus, it carries no weight on review.[7] *See Martinez,* 171 Wn.2d at 364. Because a rational trier of fact could have found that Roberts failed to prove that it was more likely than not that he was not the one who shot Villaseñor and did not "solicit, request, command, importune, cause, or aid the commission" of the shooting, his claim fails. As the evidence does not support this element of the affirmative defense, Roberts' counsel did not perform deficiently by choosing not to raise it on this trial record, and thus, Roberts has failed to establish deficient performance. Accordingly, we need not reach the prejudice prong under *Strickland*. *See Coristine*, 177 Wn.2d at 379-80; *Hendrickson*, 129 Wn.2d at 78.

III.   Testimony about Music Video and Rap Lyrics

Roberts contends the trial court erred when it admitted Wheeler's testimony concerning the meaning of Roberts' rap lyrics and he specifically challenges Wheeler's testimony on the grounds that it was an "intentional appeal to racial bias." His arguments are specious.

---

[7] Roberts also appears to assign error to the trial court's finding that his testimony was not credible. Again, this is not a finding subject to our review. *Martinez*, 171 Wn.2d at 364.

"Trial courts determine whether evidence is relevant and admissible, and appellate courts review the trial court's rulings for abuse of discretion."  *State v. Jennings*, 199 Wn.2d 53, 59, 502 P.3d 1255 (2022).  "Discretion is abused when the trial court's decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons."  *State v. Blackwell*, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993).[8]  "The party challenging an evidentiary ruling bears the burden of proving the trial court abused its discretion."  *State v. Briejer*, 172 Wn. App. 209, 223, 289 P.3d 698 (2012).

"Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  ER 401.  "Even minimally relevant evidence is admissible."  *State v. Darden*, 145 Wn.2d 612, 621, 41 P.3d 1189 (2002); ER 402.  However, relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice."  ER 403.

Under ER 702, the trial court may allow an expert witness to testify in the form of an opinion concerning "scientific, technical, or other specialized knowledge" if it "will assist the trier of fact to understand the evidence."  Expert testimony is admissible if the witness is qualified as an expert and the testimony is helpful to the finder of fact.  *State v. Morales*, 196 Wn. App. 106, 122, 383 P.3d

---

[8] "A decision is based 'on untenable grounds' or made 'for untenable reasons' if it rests on facts unsupported in the record or was reached by applying the wrong legal standard." *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003) (quoting *State v. Rundquist,* 79 Wn. App. 786, 793, 905 P.2d 922 (1995)).  "A decision is 'manifestly unreasonable' if the court, despite applying the correct legal standard to the supported facts, adopts a view 'that no reasonable person would take.'" *Id.* (quoting *State v. Lewis*, 115 Wn.2d 294, 298-99, 797 P.2d 1141 (1990)).

539 (2016). Such testimony is helpful to the fact finder "'if it concerns matters beyond the common knowledge of the average layperson and is not misleading.'" *Id.* at 122-23 (quoting *State v. Groth*, 163 Wn. App. 548, 564, 261 P.3d 183 (2011)).

According to Roberts, Wheeler's testimony interpreting certain words from Roberts' written rap lyrics and music video, which described his participation in a crime similar to the one charged, "lacked a foundation and was irrelevant and highly prejudicial."

### A.     Roberts' Music Video

After KCSO released information to the media, Roberts was profiled on WMW with his picture and a brief description of the case. Shortly after the details were released to the public, Wheeler discovered a social media account with a page containing the picture of Roberts from WMW and a reference to the report that stated Roberts was wanted for "home invasion murder." The social media page included access to a music video in which Roberts raps about the WMW story, the charge of "Murder 1" and says, "Kick his door, stick em' up. Now I got base rock, but two powder packs is really cut."

On direct examination, the State asked Wheeler what stood out to him in those lyrics from the music video and the court separately inquired into the meaning of "base rock." The following exchanges occurred:

> [DEFENSE]: Your Honor, unless this witness is qualified as an expert, I don't think that he should be interpreting what rap music means.

> THE COURT: Well, it certainly doesn't take expertise to talk about the relevance of "kick his door" or "stick 'em up." Since I don't know what "base rock" is, I guess I need some help.

[DEFENSE]: That means—

[STATE]: I can—I can break this down a little bit more.

[STATE]: What—you said those three lines. I'm going to ask you about them separately.
"Kick his door," "stick 'em up," why did that stand out to you as you listened and watched this video?

[WHEELER]: It seemed obvious to me that it sounds like a robbery.

[STATE]: Okay. And in your experience as a detective, did you ever do—or have you ever investigated drug crimes?

[WHEELER]: Yes.

[STATE]: Have you, in the course of those cases or your years on the police force, heard the term "base rock"?

[WHEELER]: Yes.

[STATE]: What, in your experience, does "base rock" mean?

[WHEELER]: Crack cocaine.

[STATE]: So "kick his door," "stick 'em up," "now I got base rock," what does that mean to you as you were listening and watching that video?

[WHEELER]: It meant to me that he is describing robbing a drug dealer.

The music video, exhibit 162, was published and the trial court turned to

defense counsel to address his objection:

[DEFENSE]: Well, Your Honor, I'm not sure—the only way it's relevant is based on the detective's interpretation of what this means.
There's also [ER] 403 information in here, basically, or [ER] 404(b) the way there is reference to women and other things.
I think it is more prejudicial than probative, but I think that's up to the trier of fact, actually. So I'll leave that to you.

- 27 -

The trial court sustained the objection "with respect to the misogyny" in the music video. The prosecutor then clarified that she was only seeking to admit limited parts of the video:

> [T]he information in here that I would seek to admit ha[s] to do with his reference to Washington's Most Wanted, being charged with ["]Murder 1,["] and then the lines—sort of the last lines of it, "kick his door," "stick 'em up," "now I've got base rock."
>
> The rest of this stuff I'm not going to argue and the [c]ourt should not consider.

Here, Wheeler's testimony as to the meaning of "kick his door," "stick 'em up," and "base rock" was relevant under ER 401 as Roberts' lyrics seemed to describe the alleged crime and appeared to be an admission of his participation. *Darden*, 145 Wn.2d at 621 (the bar for relevance is low). As the testimony shows, the court was only unfamiliar with the term "base rock," which was a matter beyond the common knowledge of a layperson. Because Wheeler understood the term based on his experience investigating drug crimes and his testimony was both helpful to the finder of fact and not misleading, the trial court did not abuse its discretion when it admitted the testimony. *See Morales*, 196 Wn. App. at 122; *State v. Rodriguez*, 163 Wn. App. 215, 232, 259 P.3d 1145 (2011) ("Practical experience is sufficient to qualify a witness as an expert and the practical knowledge need not be acquired through personal experience.")

B.     Roberts' Lyrics in the Notebook

One of the pages in the notebook found in the apartment search subsequent to Roberts' arrest included his mother's name, Brenda Roberts, and Wheeler confirmed that, on that particular page, something stood out to him as it related to

the crime. The State offered three lines of that page, exhibit 168, and asked the court "not to consider the rest of 168." Defense counsel did not object and the trial court admitted the three lines. The first line of the lyrics read, "Need to get in touch wit my Ese, I've been needin a lick." The following exchange occurred:

[STATE]: Now, in—how long have you been in major crimes?

[WHEELER]: Three and a half years.

[STATE]: And what other units did you go through before major crimes?

[WHEELER]: Narcotics, property crimes, domestic violence, and the gang unit.

[STATE]: And how long were you in the gang unit?

[WHEELER]: Five years.

[STATE]: And how long in narcotics?

[WHEELER]: Two years.

[STATE]: How many?

[WHEELER]: Two.

[STATE]: Okay. Now, in your experience as a detective, did you interview people who sort of were involved in street-level crimes?

[WHEELER]: Routinely.

[STATE]: And in the course of investigating cases or speaking with people, have you heard the term "ese"?

[WHEELER]: Countless times.

[STATE]: And in your experience, what does "ese" mean?

[WHEELER]: "ese" is Spanish slang roughly equivalent of saying "dude" or referring to a man. It's very heavily used in Hispanic gang speech.

[STATE]: And in your experience as a detective in patrol and in the various units and speaking with people, have you heard the phrase "lick"?

[WHEELER]: Many times.

[STATE]: And in your experience, what does it mean when someone says "a lick"?

Before Wheeler responded, defense counsel objected and stated "there has to be foundation for all of this." Defense counsel contended that "this witness's interpretation of what a word means, there has to be some basis for that other than just it's interacting with street people." The trial court overruled the objection and stated that "there is enough that he can testify to what he understands 'ese' and 'lick' means on the street." The prosecutor then asked Wheeler, "So in your experience, what does 'needing a lick' mean[]?" Wheeler responded, "Sometimes it means theft in general, but it typically means robbery."

Roberts now challenges Wheeler's testimony concerning the notebook lyrics on the basis that it "interjected irrelevant and inflammatory gang connotations into the trial." According to Roberts, "Wheeler's gang expertise was not tethered to any evidence in the case" and his opinion as to the meaning of the words "ese" and "lick" was irrelevant and inherently prejudicial.

As a preliminary matter, the State points out in briefing that it was Roberts who interjected the issue of gangs into this trial during his opening statement. As he laid out Roberts' theory of the case, defense counsel said:

I asked the detectives in all . . . interviews whether they had any information that Hispanic criminal gangs included [B]lack African American people, and they all said, no, absolutely not.

> Mr. Roberts did not know Mr. Beltran, who is Hispanic. Mr. Roberts did not know [Villaseñor] except for the fact that he was a drug dealer.
> And so there is evidence in this case that the Mexican nationals in the case were members of the [Sureños][9] gang.

During cross-examination of Wheeler, defense counsel asked specifically whether Beltran was initially a suspect in this case, Hispanic, and associated with a gang; Wheeler responded in the affirmative to all three questions. In closing argument, defense counsel leaned into this theory:

> It's been stated during this trial that Mr. Beltran, who is Hispanic, was a known cartel gang member.
> . . .
> [T]he evidence does not show that Mr. Roberts was an accomplice of anybody. And I think the evidence, if looked at carefully, will indicate there was one bad guy down there.
> And Detective Wheeler said, to his credit, as did I believe the Tacoma detective, that Mr. Beltran was and is still a suspect in this. It was either Detective Wheeler or the Tacoma detective that said, African-American individuals—[B]lack individuals do not hang out with Mexican gang members.

More critically, the trial court did not abuse its discretion when it found the meanings of the terms "ese" and "lick" were relevant to this case; Roberts used those words in writing about what appeared to be a description of the offense at issue. Moreover, Wheeler established a sufficient foundation in order to offer testimony about his understanding of the meaning of those words based on multiple years of experience in narcotics and gang units in which he has heard the term "ese" countless times and the term "lick" many times. *Rodriguez*, 163 Wn. App. at 232.[10]

---

[9] The name of this gang is misspelled in the transcript as "Serranos."

[10] Because Roberts only objected on the basis of foundation and relevance at trial and he does not address RAP 2.5 in order to challenge Wheeler's testimony as to the meaning of "ese" and "lick" under the separate basis of unfair prejudice, we do not consider his argument, raised for

C. Race-Based Prosecutorial Misconduct

Roberts also challenges Wheeler's testimony on the ground that the prosecution presented it as an "intentional appeal to racial bias." He dedicates a significant portion of briefing to his contention that the prosecutor committed race-based misconduct that deprived him of a fair trial. The argument is without merit.

"A prosecutor gravely violates a defendant's Washington State Constitution article I, section 22 right to an impartial jury when the prosecutor resorts to racist argument and appeals to racial stereotypes or racial bias to achieve convictions." *State v. Monday*, 171 Wn.2d 667, 676, 257 P.3d 551 (2011). "[T]o prevail on a claim of race-based prosecutorial misconduct, the defendant must demonstrate that the prosecutor's conduct was both improper and prejudicial by showing that they *flagrantly or apparently intentionally* appealed to racial bias in a manner that undermined the defendant's credibility or the presumption of innocence." *State v. Bagby*, 200 Wn.2d 777, 790, 522 P.3d 982 (2023). "If the prosecutor's conduct flagrantly or apparently intentionally appealed to racial or ethnic bias, then reversal is required." *State v. Zamora*, 199 Wn.2d 698, 715, 512 P.3d 512 (2022).

When analyzing claims of prosecutorial misconduct involving racial bias, this court applies the objective observer standard. *Bagby*, 200 Wn.2d at 792. Thus, in assessing whether the prosecutor flagrantly or apparently intentionally appealed to racial bias, this court asks "whether an objective observer could view

_____

the first time on appeal, that Wheeler's testimony was also unfairly prejudicial. *State v. Henson*, 11 Wn. App. 2d 97, 102, 451 P.3d 1127 (2019) (Unless an appellant establishes a claim of manifest constitutional error pursuant to RAP 2.5(a)(3), they "may only assign error in the appellate court on the specific ground of the evidentiary objection made at trial.").

the prosecutor's questions and comments as an appeal to jurors' potential prejudice, bias, or stereotypes in a manner that undermined the defendant's credibility or the presumption of innocence." *Id.* at 793 (footnote omitted). An "objective observer" is defined as an "individual who is aware of the history of race and ethnic discrimination in the United States and that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have influenced jury verdicts in Washington State." *Id.* at 793 n.7.

"We assess the conduct within the context of trial." *Zamora*, 199 Wn.2d at 718. When examining the prosecutor's conduct, "we consider (1) the content and subject of the questions and comments, (2) the frequency of the remarks, (3) the apparent purpose of the statements, and (4) whether the comments were based on evidence or reasonable inferences in the record." *Bagby*, 200 Wn.2d at 794.

Regarding the first factor, the prosecutor asked Wheeler what the meaning of the words "ese" and "lick" meant based on his experience. Wheeler responded that "'ese' is Spanish slang roughly equivalent of saying 'dude' or referring to a man. It's very heavily used in Hispanic gang speech." The prosecutor then asked Wheeler, "So in your experience, what does 'needing a lick' mean[]?" Wheeler responded, "Sometimes it means theft in general, but it typically means robbery." Second, Wheeler's reference to "Hispanic gang speech" was used once and the prosecutor did not repeat it. However, the issue of race and racial stereotypes was frequently highlighted by the defense. Again, in opening statement, cross-examination of Wheeler, and closing argument, defense counsel emphasized that Roberts was Black and that Beltran was Hispanic and a member of a gang. Third,

the prosecutor's apparent purpose for eliciting the testimony was to show that Roberts was describing the circumstances of the burglary in his music video and rap lyrics. The lyrics seemed to contradict the defense theory and they described the alleged crime in a way that fit the State's presentation of the case. Fourth, the prosecutor's questions and Wheeler's responses were based entirely on the evidence presented at trial. The trial court admitted the music video and written lyrics, and as discussed, did not abuse its discretion in doing so. Overall, these factors all weigh against Roberts' claim of race-based prosecutorial misconduct. As no objective observer could view the prosecutor's questions and comments, within the context of the trial as a whole, as an appeal to the judge's potential prejudice, bias, or stereotypes, the prosecutor did not commit race-based misconduct.

IV.    Demonstrative Exhibit and Accompanying Testimony

Roberts assigns error to the admission of Wheeler's testimony regarding demonstrative evidence of the shooting and his opinion on the location of the person who shot Villaseñor.

"The use of demonstrative evidence is encouraged when it accurately illustrates facts sought to be proved." *State v. Finch*, 137 Wn.2d 792, 816, 975 P.2d 967 (1999). "Demonstrative evidence may be admissible if the experiment was conducted under conditions reasonably similar to conditions existing at the actual event." *State v. Stockmyer*, 83 Wn. App. 77, 83, 920 P.2d 1201 (1996). "If the similarity is sufficient to justify admission, any lack of similarity goes to the weight of the evidence." *Finch,* 137 Wn.2d at 816. Demonstrative evidence "need

not exactly portray the event in question," rather, the test is "'whether it tends to enlighten the [trier of fact] and to enable them more intelligently to consider the issues presented.'" *Id.* (internal quotation marks omitted) (quoting *Jenkins v. Snohomish County Pub. Util. Dist. No. 1*, 105 Wn.2d 99, 107, 713 P.2d 79 (1986)). The trial court's ruling is reviewed for an abuse of discretion. *Id.* "A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons." *State v. Lord*, 161 Wn.2d 276, 283-84, 165 P.3d 1251 (2007).

On direct examination by the State, Wheeler explained that, in February 2020, he returned to the location of the shooting "to have another look at the basement of the house" and test the theory that "a third person could be between two people having this gunfight." Wheeler stated that he went with KCSO Deputy Scott Tompkins who is "six[ foot ]five" and roughly the same size as Roberts. Wheeler was aware of Roberts' physical size through information from the state Department of Licensing and other sources, which varied somewhat but ultimately established that Roberts was "consistently six[ foot ]four, high 200s, 280 to 300 pounds." Defense counsel objected and the following exchange occurred:

> [DEFENSE]: Your Honor, I don't know if this is the appropriate time, but I'm going to object to any reenactment until there is a foundation that this witness knew where a shooter was standing, knew the size of the shooter. There is—it's almost—
>
> THE COURT: Well, it's not the size—
>
> [DEFENSE]: It's almost worth a *Frye*[11] test. I don't know that this experiment is relevant.

---

[11] *Frye v. United States*, 54 U.S. App. D.C. 46, 293 F. 1013 (1923).

THE COURT: I think it's relevant to, I guess, the size of the hallway outside the door for which the gunfight was.

[DEFENSE]: Actually, it's apparent that there was a shooter in the bathroom.

THE COURT: Well, I don't know what he's going to say, but I have an interesting (unintelligible), so I'm going to overrule the objection.

Wheeler went on to explain that they brought a KCSO photographer, a "rubber dummy gun," and "[w]ith a black Sharpie, [Wheeler] drew on Deputy Tompkins' hand the entry and exit wound" based on Roberts' injury, which Wheeler had photographed. Wheeler asserted that he had Tompkins stand in a variety of places, "starting in the threshold of the victim's bedroom doorway" and "mov[ing] backwards step by step until he was in the bathroom." The State offered the photographs as exhibits 169 through 182, defense objected "for the same reasons that [he] articulated previously," but the trial court overruled the objection and admitted the exhibits. Wheeler then described the exhibits and the different angles and positions depicted in the photographs. He noted, "A variety of positions were attempted, and I think we were doing just about anything that seemed reasonable." At no point during his direct examination by the State did Wheeler either offer an opinion as to the location of the shooter or draw a conclusion based on the demonstrative evidence.

On cross-examination, defense counsel asked, "[D]o you know if the shooter was standing in the bathroom at one point and the shell casings hit the wall or the bathtub?" Wheeler answered, "It suggests that, yes." Defense counsel then elected to read portions of Wheeler's report:

- 36 -

[DEFENSE]: Okay. And I'm reading from your report, ["]considering the location of the shell casings and bullet strikes, we concluded that the suspect shooter had fired from both the area of the bedroom doorway and from just inside the bathroom across the hall.["]
That's you, right? That's what you wrote.

[WHEELER]: I don't know if I wrote that or not. I don't have my report.

[DEFENSE]: ["]It seemed extremely unlikely or impossible that a first suspect in the hallway or bathroom and Villase[ñ]or could have exchanged gunfire with a second suspect in between without the second suspect being struck several times.["]
Does that sound familiar?

[WHEELER]: I would agree with that, yes.

In briefing, Roberts cites multiple cases addressing the *Frye* standard for admissibility of expert testimony. "The *Frye* test is implicated only where the opinion offered is based upon novel science." *Anderson v. Akzo Nobel Coatings, Inc.,* 172 Wn.2d 593, 611, 260 P.3d 857 (2011). Because none of Wheeler's challenged testimony was based on novel science, *Frye* is wholly inapposite here. Further, while *Frye* was briefly mentioned in the context of the defense objection, Roberts did not seek a hearing under *Frye* and the issue is not preserved for appeal. *See In re Det. of Taylor*, 132 Wn. App. 827, 836, 134 P.3d 254 (2006) ("When a party fails to raise a *Frye* argument below, a reviewing court need not consider it on appeal.").

The trial court ruled that Wheeler's testimony was relevant to "the size of the hallway outside the door for which the gunfight was." Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." ER 401. "Even minimally relevant evidence is admissible." *Darden*, 145 Wn.2d at 621. Moreover,

- 37 -

demonstrative evidence need not replicate the event perfectly; it only needs to be similar enough to "'enlighten the [trier of fact] and enable them more intelligently to consider the issues presented.'" *Finch*, 137 Wn.2d at 816 (internal quotation marks omitted) (quoting *Jenkins*, 105 Wn.2d at 107). Here, it provided evidence to the finder of fact that showed the size of the area outside the decedent's door, exhibiting potential scenarios of the shooting with a detective who was roughly the same size as Roberts, and portrayed a theory that there may have been a third person behind the door during the shooting. Because Roberts makes no argument that the size of the hallway outside the door was irrelevant to the shooting, which it was not, and he does not satisfy his burden to show that the trial court's ruling was an abuse of discretion, his challenge to the demonstrative evidence fails. *Briejer*, 172 Wn. App. at 223 (party challenging trial court's evidentiary ruling has burden of proving it was abuse of discretion).

Roberts then asserts that "[o]pinions about how a crime occurred based on a reconstruction or reenactment of events may be offered only by qualified experts." He contends that Wheeler's opinion on the location of the shooter was improper, as either lay or expert testimony, and the court erred in admitting it. However, the "invited error doctrine 'precludes a criminal defendant from seeking appellate review of an error [they] helped create.'" *State v. Tatum*, 23 Wn. App. 2d 123, 128, 514 P.3d 763 (alteration in original) (quoting *State v. Carson*, 179 Wn. App. 961, 973, 320 P.3d 185 (2014)), *review denied*, 200 Wn.2d 1021 (2022). An error is invited if it results from an "affirmative, knowing, and voluntary act." *State v. Mercado*, 181 Wn. App. 624, 630, 326 P.3d 154 (2014). When challenged

testimony is directly elicited by the defense, the invited error doctrine applies and prohibits review of the claimed error. *State v. McPherson*, 111 Wn. App. 747, 764, 46 P.3d 284 (2002). Because Wheeler did not provide an opinion or conclusion as to the demonstrative experiment until defense counsel expressly elicited Wheeler's opinion on the location of the shooter, Roberts "helped create" this purported error and analysis of this challenge is barred by the invited error doctrine.

V.      Miscalculation of Offender Score

Roberts posits that the trial court erred when it added a point to his offender score due to his community custody status, which was based on two out-of-state convictions for possession of a controlled substance. We review de novo the calculation of an individual's offender score. *State v. Olsen*, 180 Wn.2d 468, 472, 325 P.3d 187 (2014).

At sentencing, the State proved that Roberts had two prior convictions from Texas for possession of a controlled substance. Appropriately, those convictions were not included in Roberts' offender score because they are not comparable to any Washington statute. *See State v. Blake*, 197 Wn.2d 170, 481 P.3d 521 (2021). However, because Roberts was on community custody at the time of this offense as a result of the Texas convictions, the sentencing court added one point to his offender score pursuant to RCW 9.94A.525(19), which provides, "If the present conviction is for an offense committed while the offender was under community custody, add one point."

The State contends the trial court properly added the point because the Texas convictions "remain valid convictions and the resulting supervision remained in effect after the *Blake* decision." We agree.

In *Blake*, our Supreme Court deemed Washington's strict liability drug possession statute, former RCW 69.50.4013(1) (2017), to be unconstitutional and void. 197 Wn.2d at 195. "A prior conviction based on a constitutionally invalid statute may not be considered when calculating an offender score." *State v. Markovich*, 19 Wn. App. 2d 157, 173, 492 P.3d 206 (2021). Thus, "penalties imposed under the invalid statute are void," including community custody. *Id*. at 174; *State v. French*, 21 Wn. App. 2d 891, 896-97, 508 P.3d 1036 (2022).

Roberts relies on *French* for the contention that his "community custody status from his out-of-state possession convictions may not score." In *French*, we rejected the State's challenge to a sentence in which the trial court declined to add one point to the offender score though French committed the offense at issue there while on community custody, 21 Wn. App. 2d at 894, but that case is materially distinguishable. Because French was serving a term of community custody pursuant to a prior conviction for possession of a controlled substance under RCW 69.50.4013(1), this court explained that the term of community custody "was a penalty imposed pursuant to an unconstitutional law" and "was void." *Id*. at 897.

Here, Roberts was not on community custody pursuant to a conviction under a void statute and he makes no argument that his Texas convictions were unconstitutional. While it is undisputed that Roberts' out-of-state convictions are not comparable to any Washington statute, they are nonetheless valid convictions

that resulted in a term of community custody. Though the convictions at issue occurred in Texas, our state was responsible for supervising Roberts' resulting community custody under those sentences pursuant to the interstate compact for adult offender supervision (ICAOS), RCW 9.94A.745. On August 23, 2017, Roberts was sentenced to a term of five years of community supervision in Texas, and on August 25, he departed from Texas to Washington pursuant to ICAOS. As of September 14, 2017, the Washington State Department of Corrections (DOC) assumed supervision of Roberts on behalf of the State of Texas. According to DOC Community Corrections Supervisor Andrea Holmes, Roberts frequently violated the conditions of his supervision; he was arrested on "non-DOC criminal charges," and on March 4, 2019, "Texas issued a nationwide extradition warrant" for him. Because Roberts was under active supervision by our state's DOC under ICAOS while serving a valid term of community custody from out-of-state convictions at the time of the present conviction, the trial court did not err in adding one point to his offender score for having committed the instant crime while on community custody. RCW 9.94A.525(19).

VI.     Victim Penalty Assessment and Interest on Restitution

Roberts' final two assignments of error go to the trial court's imposition of the victim penalty assessment (VPA) and the interest imposed on the award of restitution.

At sentencing on July 12, 2022, the trial court found Roberts to be indigent and only imposed the then-mandatory legal financial obligation, the $500 VPA, and

restitution, which was ultimately calculated at $40,000, along with additional statutorily-required interest.

Two recent statutory amendments apply. First, in light of the amendment to RCW 7.68.035(4), which took effect July 1, 2023, trial courts are now prohibited from imposing the VPA on defendants who are found indigent at sentencing. LAWS OF 2023, ch. 449, § 1. This amendment applies to Roberts because his case is on direct appeal. *State v. Ellis*, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023). Second, the statute that imposed interest on restitution was also amended, effective January 1, 2023, and RCW 10.82.090(2) now provides that the trial court "may elect not to impose interest on any restitution the court orders." LAWS OF 2022, ch. 260, § 12. Prior to waiving interest on restitution, trial courts must consider numerous factors, such as the defendant's indigency, available funds, and mental illness. RCW 10.82.090(2). This provision also applies here. *See Ellis*, 27 Wn. App. 2d at 16; *State v. Reed*, 28 Wn. App. 2d 779, 781-82, 538 P.3d 946 (2023). Accordingly, we reverse and remand for the trial court to strike the VPA from Roberts' judgment and sentence and to determine whether to impose interest on the restitution award pursuant to the factors set out in RCW 10.82.090(2).[12]

---

[12] Roberts also contends that cumulative error deprived him of a fair trial. "Cumulative error may warrant reversal, even if each error standing alone would otherwise be considered harmless." *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). However, in cases such as this, where "there are few or no errors and the errors, if any, have little or no effect on the outcome of the trial, reversal is not required." *State v. Wade*, 186 Wn. App. 749, 775, 346 P.3d 838 (2015). As we have concluded that the court did not err with regard to the various challenges presented here, the cumulative error doctrine does not apply.

VII.    Mandatory Firearm Enhancement

In its cross appeal, the State assigns error to the trial court's order that the mandatory firearm enhancement run concurrently with the base sentence imposed for murder in the first degree.  However, in its reply brief, the State requests this court affirm the conviction and sentence because "the total term imposed, 384 months, exceeds the total mandatory minimum term of 360 months."

RCW 9.94A.533(3)(e) provides, in relevant part, as follows: "Notwithstanding any other provision of law, *all firearm enhancements under this section are mandatory, shall be served in total confinement, and shall run consecutively to all other sentencing provisions*, including other firearm or deadly weapon enhancements, for all offenses sentenced under this chapter." (Emphasis added.)

"[F]ixing penalties for criminal offenses is a legislative, and not a judicial, function."  *State v. Manussier*, 129 Wn.2d 652, 667, 921 P.2d 473 (1996).  In *State v. Brown*, our Supreme Court held that "judicial discretion to impose an exceptional sentence does not extend to a deadly weapon enhancement."  139 Wn.2d 20, 29, 983 P.2d 608 (1999), *overruled as to juvenile offenders by State v. Houston-Sconiers*, 188 Wn.2d 1, 391 P.3d 409 (2017).  Subsequently, in *Houston-Sconiers*, the court held "that in sentencing *juveniles* in the adult criminal justice system, a trial court must be vested with full discretion to depart from the sentencing guidelines and any otherwise mandatory sentence enhancements, and to take the particular circumstances surrounding a defendant's youth into account."  188 Wn.2d at 34 (emphasis added).  As this court has recently explained, "*Houston-*

*Sconiers* overruled *Brown* only as applied to juveniles." *State v. Wright*, 19 Wn. App. 2d 37, 51, 493 P.3d 1220 (2021). Thus, "*Brown* remains good law as applied to adult offenders" and sentencing courts do "not have discretion to run the firearm enhancements concurrently" with adult offenders. *Id.* at 52.

Roberts was 24 years old at the time of the murder. Based on defense mitigation reports, the trial court found that, "while [Roberts] was not a statutory juvenile at the time of the murder[,] his brain development included adolescent tendencies." The court also found that Roberts "suffers from untreated post[]traumatic stress disorder, paranoid personality disorder, narcissistic personality disorder, generalized anxiety disorder[,] and substance use disorder." Those diagnoses, the court found, "are based, in part, upon his relative youth." The trial court then imposed 384 months of confinement for the conviction for felony murder in the first degree and 120 months of confinement for the mandatory firearm enhancement, and ordered that time to run concurrently. This was erroneous. The trial court had no discretion to order that the mandatory firearm enhancement run concurrently because Roberts was an adult when this crime was committed. Our Supreme Court has not extended the sentencing discretion described in *Houston-Sconiers* to youthful but adult offenders such as Roberts and we decline to do so here. On remand, the trial court must correct the sentence to conform to the statutory bounds for the underlying crime and the mandatory

consecutive time for the firearm enhancement as set out by our legislature for adult offenders.

Affirmed in part, reversed in part, and remanded.

WE CONCUR: